2022 UT App 37

## THE UTAH COURT OF APPEALS

JON F. BUTLER,
Appellant and Cross-appellee,
*v.*
MEDIAPORT ENTERTAINMENT INC. AND RED TOUCH MEDIA LTD.,
Appellees and Cross-appellants.

Opinion
No. 20200465-CA
Filed March 24, 2022

Third District Court, Salt Lake Department
The Honorable Andrew H. Stone
No. 130901072

Diana J. Huntsman and David C. Harless,
Attorneys for Appellant and Cross-appellee

Barry N. Johnson, Daniel K. Brough, and Ryan M.
Merriman, Attorneys Appellees and
Cross-appellants

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES JILL M. POHLMAN and RYAN D. TENNEY concurred.

HARRIS, Judge:

¶1     The district court excluded all evidence supporting Jon F. Butler's counterclaims—filed against his former employer in litigation over the validity of a specific employment agreement—because Butler made only vague disclosures regarding the computation of his claimed damages. The court then summarily dismissed those counterclaims for lack of evidence. Butler appeals that dismissal, asserting that his damages disclosures were sufficient or, in the alternative, that his failure to make proper disclosures was harmless under the circumstances. Butler's former employer—Mediaport Entertainment Inc.

(Mediaport)—cross-appeals the denial of its motion for attorney fees. We affirm the district court's rulings in all respects.

BACKGROUND

¶2      In 2001, Butler founded a company—Mediaport—to market and sell a system he invented for selecting and downloading music tracks onto a CD or similar device. Some years later, Mediaport was acquired by Red Touch Media Ltd., and Butler continued to work for the company after the acquisition. For ease of reference, unless otherwise specified, we refer to the company simply as "Mediaport," regardless of whether our reference points to a pre-acquisition or post-acquisition event.

¶3      In 2012, roughly a year after the acquisition, Butler provided the company's new owners with a copy of an employment agreement (the Agreement) that he claimed he and Mediaport had entered into before the acquisition. The Agreement contained provisions stating that, upon his termination for any reason other than for cause, Butler would "be entitled to severance in an amount equal to three (3) full years of Base Salary," as well as "all compensation and benefits earned but not yet paid," including credit for "unused vacation, sick and personal days." "Base Salary" is defined in the Agreement by reference to an attached "Schedule A," which in turn specifies that Butler's "Base Salary," as of July 1, 2003, was $130,000 per year. The Agreement also provided that "[a]ny dispute, controversy, or questions arising under, out of, or relating to this Agreement . . . shall be referred for arbitration," and that, "[i]n connection with any arbitration, the prevailing party shall be entitled to recover its costs and reasonable attorneys' fees."

¶4      In February 2013, Mediaport terminated Butler's employment, and Butler claimed entitlement to the severance

benefits discussed in the Agreement. But Mediaport refused to pay those benefits, apparently espousing the belief that the Agreement was neither valid nor enforceable, and that it had additionally been superseded by another arrangement. That same month, Mediaport initiated this lawsuit, stating several claims for relief against Butler, including damages claims, but chiefly a request for a judicial declaration that the Agreement was unenforceable and that Mediaport owed Butler nothing.

¶5     Butler responded by filing a counterclaim. In addition to claims for declaratory and injunctive relief regarding the Agreement's validity, Butler's initial counterclaim contained two different claims for damages: one for breach of contract and another for conversion. Butler later amended his pleading to include additional damages claims; as amended, Butler's counterclaim stated five such claims against Mediaport. First, Butler accused Mediaport of breaching the termination and severance provisions of the Agreement; on this claim, Butler sought "a sum exceeding one million dollars ($1,000,000.00)."[1] Second, Butler set forth a claim for breach of the implied covenant of good faith and fair dealing, accusing Mediaport of "diluting his shares" of stock in the company and damaging him "in an amount to be determined at trial, but in no event less than $150,000.00." Third, Butler stated a claim of conversion, accusing Mediaport of improperly taking some of his personal items from his office while he was away, and asserting that he had been

---

1. In his original counterclaim, Butler included a statement in the "background facts" section alleging that Mediaport had "failed to pay [him] three times his annual salary at the time [Mediaport] was acquired by Red Touch . . . , as required by" the Agreement. But that statement was not included in Butler's amended counterclaim, which superseded the original; the amended document contains no direct references to Butler being entitled to recover three times his salary as severance.

damaged "in an amount to be determined by the fact-finder."
Fourth, Butler set forth a defamation claim, accusing Mediaport
of "ma[king] and publish[ing] false statements" about him, and
damaging him in an unspecified amount. Finally, Butler accused
Mediaport of tortiously interfering with his business and
contractual relations, asserting that he had been damaged "in an
amount to be proven at trial, but no less than $200,000.00."
Butler also sought "costs and attorneys' fees" under the "terms
of the [Agreement]." Butler attached a copy of the Agreement to
his amended counterclaim.

¶6    Butler's initial disclosures—which he served on
Mediaport after filing his initial counterclaim but before filing
the amended one—contained the following damages disclosure,
quoted here in its entirety:

> Because of the lack of documents available to
> [Butler], he cannot provide an exact calculation of
> damages at this time. It is estimated that the
> damages suffered by [Butler] approximate
> $900,000.

Butler's initial disclosures contained no further computation or
categorization of damages, nor any explanation of how he
arrived at the $900,000 figure. Butler produced some 150 pages
of documents with his initial disclosures, but none of those
documents purported to offer any computation of damages. And
although Butler once supplemented his initial disclosures, that
supplement did not provide any additional information
regarding computation of damages. Butler never supplemented
his damages disclosures.

¶7    During the discovery period, Mediaport asked Butler via
interrogatory to "[i]dentify all facts supporting your allegation,
contained in . . . the Counterclaim, that . . . [Mediaport is]
indebted to [Butler] for accrued benefits under the terms of [the

Agreement] in a sum exceeding on[e] million dollars ($1,000,000)." Butler responded as follows:

> All of [Butler's] records were either turned over to Mediaport . . . or were retained by the company . . . . For this reason [Butler] cannot respond with certainty to this interrogatory. [Mediaport has] the [Agreement], which speaks for itself. Specifically, the contract called for severance benefits, which included, but were not limited to, payment of three times the annual salary, compensation for benefits, and pre-payment of legal fees in litigation to enforce the contract. These severance benefits have not been paid and are estimated to exceed $1,000,000.00 in value.

¶8 Mediaport also took Butler's deposition and asked him questions about his claim for breach of the termination and severance provisions contained in the Agreement. When asked what his base salary was when he first had one, Butler responded that it was "130." But Butler maintained that he had never actually been paid $130,000 per year because Mediaport had been "deferring" some of his compensation; he also had a hard time answering questions related to how much salary he had actually been paid while in Mediaport's employ.

¶9 During the deposition, Mediaport asked Butler questions about a letter (the Hubbard Letter) that had been written by Mediaport's chief operating officer (COO) in 2012, just months before Butler was terminated. That letter contained a tally of the value of the vacation and sick days Butler had purportedly accrued, as well as two alternative tallies of the deferred compensation Butler had purportedly accrued. The Hubbard Letter also contained a reference to a possible increase in Butler's base salary, from $130,000 to $190,000.

¶10 The fact discovery period ended in June 2015. After that, the litigation stagnated for several years, with neither party taking any meaningful action to move it forward toward trial. Finally, in early 2018, Mediaport filed a motion in limine seeking to exclude all of Butler's damages-related evidence, asserting that Butler had failed to comply with the disclosure obligations set forth in rule 26(a)(1) of the Utah Rules of Civil Procedure. At the same time, Mediaport also filed a motion for summary judgment, arguing that, if its motion in limine were granted, Butler would be bereft of evidence supporting his claimed damages and that all his claims would on that basis be subject to dismissal.

¶11 After full briefing and oral argument, the district court granted both motions, but only in part. The court first determined that Butler's damages disclosures "fail[ed] to meet the requirements of" rule 26(a)(1). The court next examined whether Butler's noncompliance with the rule's requirements was harmless and determined that, for many of his counterclaims, it was not. Regarding all of Butler's claims other than the one for breach of contract, the court concluded that Butler's faulty disclosures had harmed Mediaport because those claims alleged nonspecific damages and Butler had made no effort, during discovery or otherwise, to illuminate the amount of damages he sought on those claims. The court therefore excluded all of Butler's damages-related evidence related to those claims, and ruled that Mediaport was entitled to summary judgment on each of them due to Butler's inability to prove damages.

¶12 With regard to Butler's claim for breach of contract, however, the district court's ruling was more complex. The court concluded that Mediaport was in possession of sufficient information—through sources other than Butler's initial disclosures (specifically, from Butler's counterclaim and from information learned during discovery)—to be able to understand

and defend against Butler's claim for payment of three times his base salary upon termination. In the court's view, this portion of Butler's damages was "readily calculated given an existing salary," and therefore Butler's failure to provide that calculation in a formal damages disclosure was harmless. As to Butler's claims for payment of deferred compensation and benefits upon termination, the court made no definitive ruling, but concluded that Butler's disclosure failures might be considered harmless if Mediaport possessed evidence demonstrating that "the parties each understood that specific amounts were owing to Butler," but that they would not be considered harmless if the amount of Butler's entitlement were "subject to factual debate." The court therefore allowed Butler's counterclaim for breach of contract to survive and proceed toward trial. Sometime later, the court scheduled a ten-day jury trial to take place in March 2020.

¶13 Less than two weeks before the trial was scheduled to begin, Mediaport filed a renewed motion in limine, asking the court to reconsider its earlier decision and this time exclude Butler's damages-related evidence regarding his breach of contract claim. In the motion, Mediaport asserted that a recent opinion from our supreme court—*Keystone Insurance Agency, LLC v. Inside Insurance, LLC*, 2019 UT 20, 445 P.3d 434—required exclusion of Butler's damages evidence and dismissal of his last remaining claim for damages. The court heard argument on the motion at a final pretrial conference and, at the conclusion of the hearing, granted the motion. In the court's view, Butler's claims for post-termination deferred compensation and unpaid benefits were directly foreclosed by *Keystone*. The court noted that if it were to find Butler's disclosures harmless merely because "there ended up being information [e.g., the Hubbard Letter] in the possession of [the] defendant that indicated what [the] damages were," exclusion of evidence for faulty damages disclosures would almost never occur, because in "most every commercial case a plaintiff could later point to some document that supports their [damages] theory and say 'That's been my theory all

along.'" And while the court acknowledged that Butler's claim for payment of three times his base salary at termination presented a closer question, the court excluded Butler's evidence supporting his damages on that claim too, concluding that Butler's disclosure had "lumped together" all of his contract claims, and that "there is debate" about the proper salary figure to use in the Agreement's treble multiplier. Accordingly, the court excluded "all evidence" supporting Butler's contractual damages claims, and on that basis dismissed Butler's counterclaim for breach of contract, with prejudice and on the merits.

¶14 Following the court's ruling, Mediaport agreed that, "without a claim for breach of the [Agreement] by Butler, [it had] no reason to try [its] claims" against him, and it consented to dismissal of its claims without prejudice. In light of that concession, Butler's counsel agreed that "if there's no damages, [then] I don't think there's any case left," and the court determined that any decision it might make on Butler's claims for declaratory relief "would be an advisory opinion," and therefore that claim too was subject to dismissal.

¶15 Following the court's dismissal of all claims, both sides filed post-judgment motions. Butler filed a motion to alter or amend the judgment, asking the court to reconsider its ruling. The court denied that motion. For its part, Mediaport filed a motion seeking some $200,000 in attorney fees, arguing that it was entitled to fees pursuant to the Agreement and Utah's reciprocal attorney fees statute, *see* Utah Code Ann. § 78B-5-826 (LexisNexis 2018), even though its position was that the Agreement was unenforceable. The court denied that motion as well, concluding that the attorney fees provision in the Agreement applied, by its terms, only to fees incurred during arbitration.

ISSUES AND STANDARDS OF REVIEW

¶16    Both sides now appeal. Butler takes issue with the district court's decision to exclude his damages-related evidence and on that basis dismiss his damages counterclaims.[2] Mediaport, in a

---

2. Butler also raises two additional arguments that do not merit extended discussion. First, he complains that Mediaport's renewed motion in limine was, in actuality, a tardy and disguised motion for summary judgment. This is incorrect. We acknowledge Butler's point that parties should not be able to dodge dispositive motion deadlines by cloaking summary judgment motions under a motion in limine label. But this is not what happened here. In this case, not only was Mediaport's renewed motion in limine based on Utah Supreme Court case law—*Keystone Insurance Agency, LLC v. Inside Insurance, LLC*, 2019 UT 20, 445 P.3d 434—issued after the dispositive motion deadline, but that motion sought only exclusion of certain evidence on entirely procedural grounds; it did not ask the court to summarily consider the merits of any particular claim. The summary judgment aspect came into play only after the court granted the motion in limine, leaving Butler unable to prove damages on any of his claims. Rather than wait until the close of Butler's case-in-chief to grant an inevitable directed verdict for lack of proof of damages, the court acted appropriately, not to mention efficiently, in choosing to take up the matter prior to trial. Second, Butler contends that, by reconsidering its 2018 ruling and entering summary judgment in Mediaport's favor, the court denied Butler his constitutional right to his day in court. Not only is this argument unpreserved for our review, it also fails on the merits. Due process affords litigants an *opportunity* to be heard, not a guarantee of a day in court; having one's case dismissed on procedural grounds does not amount to a due process violation unless it can be shown that the relevant procedural requirement "foreclose[d] [a party's] meaningful

(continued…)

cross-appeal, challenges the court's denial of its motion for attorney fees.

¶17   Regarding Butler's appeal, we review for correctness the district court's conclusion that Butler's disclosures were inadequate, because that determination is at root a question of interpretation of rule 26 of the Utah Rules of Civil Procedure. *See Keystone Ins. Agency, LLC v. Inside Ins., LLC*, 2019 UT 20, ¶ 12, 445 P.3d 434 ("We review a district court's interpretation of our rules of civil procedure, precedent, and common law for correctness."). But we review for abuse of discretion the court's determination that Butler's faulty disclosures were not harmless. *See id.* ¶¶ 12, 18–19 (noting that the court, in that case, "did not abuse its discretion in finding" that a faulty disclosure was not harmless).

¶18   Regarding Mediaport's cross-appeal, in assessing a district court's decision to award (or not to award) attorney fees "pursuant to a contract, we review the district court's interpretation of the contract language for correctness." *See Robinson v. Robinson*, 2016 UT App 32, ¶ 44, 368 P.3d 147.

ANALYSIS

I. Butler's Appeal

¶19   Before ordering the exclusion of all Butler's damages-related evidence, the district court made two important

---

(…continued)
access to the justice system." *See In re adoption of B.Y.*, 2015 UT 67, ¶ 27, 356 P.3d 1215 (quotation simplified). Butler does not even attempt to make that showing; indeed, he was capable of complying with rule 26's disclosure requirements, but simply failed to do so.

determinations. First, it concluded that Butler's damages disclosures did not comply with the requirements of rule 26(a)(1)(C) of the Utah Rules of Civil Procedure. Second, the court determined that Butler's failure to comply with his disclosure obligations was not harmless. Butler challenges both of these determinations, and we examine each of them in turn, following a brief discussion of the governing law.

A

¶20 Our discovery rules—in a requirement that has been in place since 1999, and in its current basic form since 2011— require parties, at the outset of their involvement in litigation, to provide certain disclosures to their litigation opponents; parties must do so "without waiting for a discovery request." *See* Utah R. Civ. P. 26(a)(1). In addition to information about witnesses and documents supporting a party's claims, these initial disclosures must include information about the damages, if any, that parties intend to claim in the lawsuit. *See id.* R. 26(a)(1)(C). In particular, the rule requires parties to provide their opponents with "a computation of any damages claimed and a copy of all discoverable documents or evidentiary material on which such computation is based, including materials about the nature and extent of injuries suffered." *Id.* These required initial damages disclosures need not, in every case, contain a to-the-penny calculation; indeed, the drafters of the 2011 amendments to rule 26 recognized that parties may not know, at the outset of a case, exactly what their damages amount to, and that "damages often require additional discovery." *Id.* R. 26(a)(1) advisory committee's note to 2011 amendment. But the rules specify that "[a] party is not excused from making disclosures or responses because the party has not completed investigating the case." *Id.* R. 26(d)(3); *see also id.* R. 26(a)(1) advisory committee's note to 2011 amendment (emphasizing that damages disclosures should not as a matter of course simply be "deferred until expert discovery" because "[e]arly disclosure of damages information is

important" and "is a critical factor in determining proportionality"). In the drafters' view, the damages disclosure requirement is intended to require parties to "make a good faith attempt to compute damages to the extent it is possible to do so," and to "provide all discoverable information on the subject." *Id.* R. 26(a)(1) advisory committee's note to 2011 amendment.

¶21 And the rules require timely supplementation of all disclosures, including damages disclosures. *See id.* R. 26(d)(5). Under this requirement, parties who do not possess enough information at the outset of a case to provide complete damages disclosures must supplement those disclosures as soon as they discover the information needed to complete the computation. *Id.*

¶22 In the years since these damages disclosure rules were enacted, Utah appellate courts have interpreted them to require, at a minimum, a disclosure that damages are in fact being claimed, the categories of any such damages, and a description of the method by which the party intends to compute those damages. *See Keystone Ins. Agency, LLC v. Inside Ins., LLC*, 2019 UT 20, ¶ 17, 445 P.3d 434 (stating that "even if a plaintiff cannot complete its computation of damages before future events take place, the fact of damages and the method for calculating the amount of damages must be apparent in initial disclosures" (quotation simplified)); *Vanlaningham v. Hart*, 2021 UT App 95, ¶ 14 n.1, 498 P.3d 27 (citing federal cases, and quoting this language: "Where a party fails to properly identify a category of damages or to provide the calculations underlying it, it is within the court's discretion to exclude evidence relating to those damages" (quotation simplified)).

¶23 The rule itself prescribes a penalty for noncompliance with these disclosure obligations: "If a party fails to disclose or to supplement timely a disclosure . . . , that party may not use the undisclosed witness, document, or material at any hearing or

trial unless the failure is harmless or the party shows good cause for the failure." Utah R. Civ. P. 26(d)(4). On this point, the advisory committee was clear:

> The penalty for failing to make timely disclosures is that the evidence may not be used in the party's case-in-chief. To make the disclosure requirement meaningful, and to discourage sandbagging, parties must know that if they fail to disclose important information that is helpful to their case, they will not be able to use that information at trial. The courts will be expected to enforce them unless the failure is harmless or the party shows good cause for the failure.

*Id.* R. 26(a)(1) advisory committee's note to 2011 amendment; *see also Keystone*, 2019 UT 20, ¶ 16 n.4 (quoting this note with approval but recognizing that courts "attach no decisional authority to advisory committee reports").

¶24 Applying these rules and precedents, the district court determined that Butler's damages disclosures were insufficient, and did not meet the requirements of rule 26(a)(1)(C). With regard to whether Butler's failure to disclose was harmless, the court issued a series of rulings. First, in its 2018 ruling, the court determined that, regarding all of Butler's damages claims other than for breach of contract, the failure to disclose was not harmless; Butler does not appeal that ruling. Next, in that same ruling the court determined that, with regard to Butler's breach of contract claim, the failure to disclose was not necessarily harmless. In its 2020 ruling, however, the court reconsidered that second determination and concluded, in light of *Keystone*, that Butler's failure to disclose was in fact *not* harmless, even as applied to his breach of contract claim. At Butler's request, we now examine the propriety of the 2020 ruling, beginning with a

discussion of the sufficiency of Butler's damages disclosures, and concluding with a discussion of harmlessness.

B

¶25    We need not linger very long on the question of whether Butler's damages disclosures were sufficient. They quite clearly were not. As noted above, Butler's disclosures were cursory, and made no effort to either categorize his damages or offer any method by which those damages might be computed. He stated only that he was unable to provide an "exact calculation of damages at [that] time," but that he "estimated" that his total combined damages, on both of his damages claims then pleaded, would "approximate $900,000." At the time Butler made this disclosure, he had stated counterclaims for both breach of contract and conversion, and his disclosure made no effort to differentiate the damages between those claims. As was made clear later, even his breach of contract claim encompassed several different aspects of damages (e.g., benefits, deferred compensation, and severance), and he made no effort to categorize or quantify those claims either.

¶26    Butler also made no effort whatsoever to supplement his damages disclosures, even though he later amended his counterclaim to include three new damages claims. He did make one disclosure supplementation—thus evidencing an awareness of the requirement—but that supplementation had nothing to do with damages.

¶27    Butler attempts to justify his rather spare disclosures by relying on *Williams v. Anderson*, 2017 UT App 91, 400 P.3d 1071. In that case, the plaintiff's chief damages claim was for recovery of 30% of the purchase price that one company paid for another. *Id.* ¶ 3. In his initial disclosures, the plaintiff stated this computation quite plainly, although he offered no final claimed damages number and did not specify the purchase price that would need to be multiplied by 30%. *Id.* ¶¶ 5, 7. We held this

disclosure to be sufficient, noting that it "described the precise components [that the plaintiff] intended to factor into his damages claim," including "both the fact of damages and the method by which those damages would be calculated." *Id.* ¶ 19. We stated that, because the plaintiff had described "the process for calculating his claimed" damages, it met the requirements of rule 26(a)(1)(C). *Id.*

¶28    This case is quite different from *Williams*. In particular, Butler's damages disclosure was far less specific than the one at issue in *Williams*. Although the *Williams* disclosure included a clear formula to be used in computing the single item of compensatory damage, Butler's disclosure simply stated an estimated number, and made no effort to offer any method by which that number might be computed. Moreover, in *Williams*, there was no uncertainty about the purchase price that would need to be multiplied by 30%; the plaintiff did not know what that price was at the time its disclosures were made, but the defendant did. *See id.* In this case, there was a lot of uncertainty about the amounts Butler was claiming as damages, even regarding the less complex aspects of his breach of contract claim. *See infra* ¶ 46.

¶29    Butler also points to documents other than his disclosures—such as his counterclaim, his discovery responses, and the Hubbard Letter—that contained information he claims he intended to use to prove his damages. But while those other sources (discussed in more depth below) may be relevant to whether his failure to disclose was harmless, they have no role to play in evaluating whether his disclosures—viewed on their own—met the requirements of rule 26(a)(1)(C).

¶30    Under the circumstances presented here, Butler's damages disclosures were insufficient. Although they included an estimated total figure, and thus indicated that Butler would be claiming damages, those disclosures lumped all of Butler's

damages claims together and made no effort to either categorize Butler's damages claims or offer any method by which any of those damages might be computed. Such a disclosure falls well short of the mark set out in rule 26, and the district court did not err in so concluding.

C

¶31    Because Butler's damages disclosures were insufficient, Butler's damages evidence is to be excluded unless Butler's failure to disclose "is harmless" or Butler can show "good cause" for his failure. *See* Utah R. Civ. P. 26(d)(4). In his brief, Butler focuses almost exclusively[3] on the harmlessness option, and asserts that his failure to disclose visited no harm on Mediaport because the company had access, from other sources, to information sufficient to allow it to defend against Butler's damages claims. For the reasons discussed, we conclude that the district court did not abuse its discretion in concluding that the inadequacies in Butler's damages disclosures were not harmless.

---

3. Butler contends, as an alternative to harmlessness, that he had "good cause" for failing to provide adequate damages disclosures, proffering as cause his asserted "reliance" on the district court's 2018 ruling. This argument suffers chiefly from chronological infirmities: Butler's failure to provide sufficient initial disclosures during the fact discovery period, which ran until 2015, cannot be justified by a 2018 court ruling. Indeed, Butler does not adequately explain how his failure to provide damages disclosures had anything to do with the court's ruling. After all, the 2018 ruling was made in response to Mediaport's motion challenging the adequacy of those very disclosures. Butler appears to argue that he relied on the 2018 ruling by "proceed[ing] with this case for two years" and by "preparing for trial," but these actions do nothing to explain why Butler failed to provide adequate disclosures in the first place.

¶32 Before delving into the merits of the harmlessness inquiry, we pause to note two procedural hurdles that work against Butler here. First, as previously noted, *see supra* ¶ 17, we review the district court's harmlessness decision for abuse of discretion. Under this standard of review, "[t]he question presented is not whether we" would have made the same decision had we been in the district court's shoes, but instead whether "we find an abuse of discretion in the district [court's] decision." *See Stichting Mayflower Mountain Fonds v. United Park City Mines Co.*, 2017 UT 42, ¶ 49, 424 P.3d 72; *see also Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2015 UT App 261, ¶ 24, 361 P.3d 703 (Orme, J., concurring) (stating that, under an abuse of discretion standard of review, we will affirm even if we might not have made the same decision, so long as the decision "was within the broad range of discretion entrusted to" the district court). Second, Mediaport bears no burden to demonstrate that it was harmed by Butler's inadequate disclosures; instead, it is Butler who bears the burden of demonstrating harmlessness. *See Keystone Ins. Agency, LLC v. Inside Ins., LLC*, 2019 UT 20, ¶ 18 n.7, 445 P.3d 434 ("Under a plain language reading of rule 26(d)(4), the burden to demonstrate harmlessness or good cause is clearly on the party seeking relief from the disclosure requirements.").

¶33 On the merits of the harmlessness inquiry, the "key question" is "whether a plaintiff's failure to disclose its categories and methods of computing damages impaired the defense's ability to 'properly build a defense against the damages claimed.'" *Chard v. Chard*, 2019 UT App 209, ¶ 45, 456 P.3d 776 (quoting *Keystone*, 2019 UT 20, ¶ 20). Given the practical realities of modern litigation, most of a party's "defense-building" activities take place during the discovery process. Indeed, we have identified several factors for courts to consider in assessing harmlessness in this context, all of which have to do with the extent of impairment to a party's ability to build a defense during the discovery period and to make decisions

about a case that are proportionate to its size and scope. *See id.* Specifically, in this context courts should consider whether a party, despite its opponent's poor disclosures, was able to (1) "question witnesses" during discovery, (2) figure out the case's "tier status" under rule 26(c), "(3) understand the nature and quantity of the plaintiff's claimed damages, and (4) understand the scope and cost of the litigation pursued." *Id.*; *see also Keystone*, 2019 UT 20, ¶¶ 19–20.

¶34 Because this inquiry is focused on whether the potentially harmed party was able to appropriately deploy resources and discover relevant facts during the discovery period, courts assessing harmlessness should consider the point in time at which additional information that may point toward harmlessness was received by the opposing party. Where additional illuminating information was received by an opposing party "relatively early during the discovery period," within enough time to allow that party to use that information while taking depositions and propounding other discovery requests, then any inadequacies in a party's damages disclosures may turn out to be harmless. *See Chard*, 2019 UT App 209, ¶ 48. But where a party "waits until the twilight hours of fact discovery" or, worse, until "the close of expert discovery" to provide illuminating information, thereby depriving the opposing party of any meaningful opportunity to use, during discovery, the information that should have been initially disclosed, the faulty disclosures may well turn out to be harmful, especially where no extension of the discovery deadlines is sought or given. *See Keystone*, 2019 UT 20, ¶¶ 13, 19 (quotation simplified).

¶35 In addition to considering *when* an innocent party receives illuminating information, in this context we have also considered the relative *simplicity*—or complexity—of the non-disclosing party's damages claims. Where the damages claims are simple and easily computed, courts are more likely to conclude that an

innocent party's receipt of illuminating information from a source other than initial disclosures renders inadequate disclosures harmless. For instance, we concluded in *Chard* that a faulty disclosure was harmless, at least with regard to one discrete claim for unjust enrichment, where the non-disclosing party was making a simple damages claim: recovery of precisely $120,000, as described clearly in its pleadings and as set forth in two short invoices that it had produced early in the discovery period. *See* 2019 UT App 209, ¶¶ 40, 43–46; *cf. Bad Ass Coffee Co. of Hawaii v. Royal Aloha Int'l LLC*, 2020 UT App 122, ¶¶ 31–37, 473 P.3d 624 (finding a party's damages disclosures adequate, in part because the damages theory was simple and partially stipulated and the non-disclosing party explained its theory "in its counterclaim and in its initial disclosures").

¶36    On the other hand, where a non-disclosing party's damages theories are complex, it is more difficult for that party to demonstrate that inadequacies in its damages disclosures were harmless. Our supreme court's decision in *Keystone* is an illustrative example. In that case, the plaintiff sought and identified several categories of damages, including commissions allegedly earned, but it disclosed no damages computation at any point during the fact discovery period. *See Keystone*, 2019 UT 20, ¶ 5. Instead, the plaintiff "waited until the close of expert discovery to present, for the first time, its damage estimates and methodologies." *Id.* ¶ 13. The plaintiff argued, however, that its failure to disclose was harmless, because the defendant had itself generated—and produced during discovery—both a "197-page spreadsheet" that the plaintiff interpreted as tracking the earned commissions as well as a "document summarizing" the spreadsheet. *Id.* ¶¶ 6, 22. The court rejected the plaintiff's "harmlessness" argument, as well as a motion to reconsider its initial conclusions about the adequacy of the plaintiff's disclosures, noting that the plaintiff's damages theories— computation of commissions—were "more complex" than the simple one at issue in *Williams v. Anderson*, 2017 UT App 91, 400

P.3d 1071. *See Keystone*, 2019 UT 20, ¶ 23.[4] The court stated that the plaintiff's "focus on [the defendant's] possession of a spreadsheet detailing [earned] commissions misunderstands the burden placed on the plaintiff by rule 26." *Id.* The court characterized the spreadsheet as "a mere tool that could aid in the calculation of damages—*not a dispositive and clear recitation of what damages* [*the plaintiff*] *was after*." *Id.* And it concluded that, "[w]ithout a clear computation or theory of what [the plaintiff] was asking for, it was left to the guesswork of [the defendant] to determine how the spreadsheet might inform [the plaintiff's] theory of the case and what damages it was seeking." *Id.*

¶37    And in *Vanlaningham v. Hart*, 2021 UT App 95, 498 P.3d 27, we reached a similar conclusion. In that case, a former patient of a dental practice sued the clinic for malpractice. *Id.* ¶ 2. Following discovery, the district court concluded that the plaintiff had failed to satisfy her damages disclosure obligation under rule 26 because she provided only a bottom-line damages figure, and not a "mathematical computation or the methodology" explaining how that figure was derived. *Id.* ¶ 12 (quotation simplified). The plaintiff appealed, arguing that her disclosure was adequate or, alternatively, that any inadequacy was harmless. *Id.* We rejected the plaintiff's arguments,

---

4. We recognize that some of the discussion in *Keystone* regarding the complexity of the plaintiff's damages theory arose in the context of evaluating the adequacy of the plaintiff's disclosures, rather than in the context of evaluating whether any inadequacies in the plaintiff's disclosures were harmless. *See Keystone*, 2019 UT 20, ¶ 23. However, the relative complexity of the plaintiff's damages theories is an issue that can potentially shed light on *both* the underlying adequacy of a plaintiff's damages disclosures as well as whether any inadequacies in those disclosures were rendered harmless by other circumstances.

concluding that the disclosure was inadequate because the plaintiff "neglected to provide [the] [d]efendants with any information that would allow them to discern how the total was calculated," and because the defendants "were left to guess at how much of [the sum total] was for past . . . treatments, as well as what components figured into her damages claim for future treatment." *Id.* ¶ 15. We also noted that the plaintiff's damages theories were more complex than the theories at issue in *Williams* and in *Bad Ass Coffee*, noting in particular that the plaintiff's disclosed bottom-line damages figure did "not represent a single item" but instead was intended to be a composite figure including both past and future treatment and other items. *Id.* ¶¶ 17–18. And we concluded that the plaintiff's inadequate disclosures were not harmless, because the defendants "were left guessing" about how the plaintiff calculated her damages, thus "impairing their ability to properly build a defense." *Id.* ¶ 21.

¶38　In this case, Butler asserts that any inadequacies in his damages disclosures were harmless, at least with regard to his claim for breach of contract, because Mediaport was in possession of information from other sources that provided sufficient insight into Butler's contractual damages claims. Some of the information to which Butler points—for instance, explanations given at the oral argument on Mediaport's 2018 motion, and information provided in advance of the parties' 2018 mediation—was transmitted far too late to have made any difference to Mediaport's ability to build a defense during the discovery period, which ended in 2015. *See Keystone*, 2019 UT 20, ¶¶ 13, 19. But other items of information were provided earlier in the litigation, before the fact discovery period ended, and we examine those sources of information in more detail.

¶39　First, Butler points to allegations he made in his original and amended counterclaims. In the original counterclaim, Butler alleged that Mediaport failed to pay him "three times his annual salary" upon termination. That statement, however, was

removed from the amended counterclaim; in that amended pleading, Butler asserted more indirectly that he was entitled to compensation "as called for in" the Agreement, including "deferred salary and other compensation." In making these statements, Butler specifically invoked paragraphs 2 and 5 of the Agreement, a copy of which he attached to the amended pleading. He asserted that, on his contract claim alone, he was entitled to damages "in a sum exceeding" $1 million. Paragraph 2 of the attached Agreement specifies that Mediaport was to pay Butler a "Base Salary" as set forth on an attached schedule, but which was subject to being increased over time. The attached schedule indicates that, as of 2003, Butler's Base Salary was $130,000. Paragraph 5 of the Agreement is a lengthy paragraph comprising three single-spaced pages, including seven separate subsections that describe things that should happen in the event that Butler's employment was terminated. In particular, and among other things, that paragraph states that, upon termination, Butler would "be entitled to all compensation and benefits earned but not yet paid," including the value of "unused vacation, sick and personal days." It also indicates that Butler "shall be entitled to an amount equal to three (3) full years of Base Salary."

¶40　Second, Butler points to his interrogatory responses, in which he informed Mediaport that he was seeking "severance benefits, which included, but were not limited to, payment of three times the annual salary, compensation for benefits, and pre-payment of legal fees in litigation to enforce the contract," and that he "estimated" that these benefits collectively "exceed $1,000,000.00 in value."

¶41　Third, Butler points to statements he made at his deposition, where he told Mediaport that his base salary had, at first, been "130" but that he had never actually been paid that amount because Mediaport had been "deferring" some of his compensation. But in that same deposition, he also had a hard

time providing specific answers to questions related to how much salary he had actually been paid while employed by Mediaport.

¶42 And finally, Butler points to the Hubbard Letter, in which Mediaport's COO set out a purported tally of the amount of the value of vacation and sick days Butler had accrued, as well as two alternative purported tallies of the deferred compensation Butler had accrued. The letter also contained a reference to a possible increase in Butler's salary, from $130,000 to $190,000.

¶43 Pointing to all of this information, taken together, Butler asserts that Mediaport had a sufficient understanding of his damages claims to be able to adequately deploy resources and make decisions about defending the case. In particular, Butler points out that Mediaport always understood this case to be a Tier 3 case, and that it therefore understood the scope and size of the litigation he was pursuing. We acknowledge Butler's point, and agree that Mediaport, as Butler's employer, had access to a lot of information about potential damages that Butler might claim. But having access to information that may potentially help form the basis for a plaintiff's damages claims is not the same thing as possessing a concrete disclosure from the plaintiff regarding its claimed damages. We agree with the sentiments of the district court when it mused that, if possession of this sort of information were sufficient to render inadequate disclosures harmless, then harmlessness would be present in "most every commercial case." Certainly, Mediaport was in possession of information that allowed it to make some solid educated guesses about the types and amounts of damages Butler may have intended to claim. But that alone is not enough: "any ability on the part of [the defendant] to guess at potential damages does not free [the plaintiff] from its obligation to disclose a computation of damages." *See Keystone*, 2019 UT 20, ¶ 20; *see also Vanlaningham*, 2021 UT App 95, ¶¶ 19, 21 (rejecting the plaintiff's harmlessness argument because her failure to properly disclose

her damages left the defendants to "guess at the components of and how [she] calculated her . . . damages claim").

¶44 Our decision is driven, to some degree, by the relative complexity of Butler's damages theories, especially when compared to the damages theories at issue in *Williams*, *Chard*, and *Bad Ass Coffee*. *See Bad Ass Coffee*, 2020 UT App 122, ¶¶ 31–37 (stating a simple and partially stipulated theory that its damages were $500,000 because that was the agreed-upon value of certain in-kind services); *Chard*, 2019 UT App 209, ¶¶ 40, 43–46 (stating a simple theory of unjust enrichment damages: $120,000 as described clearly in pleadings and supported by two invoices); *Williams*, 2017 UT App 91, ¶ 3 (stating a simple compensatory damages theory: entitlement to 30% of the purchase price one company paid for another). In this case, Butler's damages theories are not as simple as he claims. For instance, much of the information Butler identifies lumped some or all of Butler's various—and very different—damages claims together, rather than clearly identifying a damages computation for each individual claim. Butler's initial disclosures, such as they were, asserted that he had suffered $900,000 worth of damages on his contract and conversion claims combined. Similarly, and somewhat contradictorily, Butler's amended counterclaim and interrogatory response indicated that his total damages on the contract claim alone were in excess of $1 million—an amount intended to include both the claimed severance payment (three times salary) and also deferred compensation and benefits. A plaintiff who combines several components of damages into one composite figure has, by doing so, taken action to make the situation more—not less—complex. *See Vanlaningham*, 2021 UT App 95, ¶ 18 (noting, in determining that disclosures were inadequate, that the proffered damages figure "does not represent a single item").

¶45 Moreover, Butler's reliance on the Hubbard Letter is, as the district court correctly perceived, foreclosed by *Keystone*, the

case in which our supreme court rejected a plaintiff's attempt to rely on a spreadsheet in the defendant's possession as emblematic of the adequacy of its disclosures. *See* 2019 UT 20, ¶ 23. Like the spreadsheet in *Keystone*, the Hubbard Letter is "not a dispositive and clear recitation of what damages [Butler] was after." *See id.* (emphasis omitted). Rather, the Hubbard Letter was "a mere tool that could aid in the calculation of" Butler's damages, and left Mediaport guessing as to exactly how Butler intended to interpret the document and how much weight he intended to give it. *See id.* (stating that the spreadsheet still left the defendant guessing as to how it "might inform [the plaintiff's] theory of the case").

¶46 Finally, even Butler's simplest component of damages—the part of his contract claim in which he claimed entitlement to payment of three times his salary—is not quite as simple as Butler asserts. As noted, Butler often combined this claim with other components of claimed contract damages, leaving Mediaport to wonder how big a role the severance claim played in the context of Butler's overall contract claim. But even assessing this component of damages separately, we agree with Mediaport that this claim is more complex than the "30% of an unspecified purchase price" claim at issue in *Williams*. First of all, the information at issue in *Williams* came in an actual initial disclosure, and not in a cobbled-together amalgam of later-produced documents. *See Williams*, 2017 UT App 91, ¶ 5. Furthermore, the information to which Butler points requires Mediaport to follow a series of cross-references from one document to the next, from the amended counterclaim to two specific (and lengthy) paragraphs in the body of the Agreement to a schedule appended to the Agreement. Finally, and perhaps most importantly, there remained a fair bit of confusion about the relevant "salary" figure that was supposed to be trebled. Was it the "Base Salary" identified in the original Agreement ($130,000)? Was it an increased "Base Salary" to which Butler apparently claimed entitlement later in his employment

($190,000)? Or was it his "annual salary," a phrase Butler used in his interrogatory response, which could conceivably mean either the salary to which he thought he was entitled, including unpaid deferred compensation, or the salary that he had actually been paid? As noted above, when asked how much he had actually been paid, Butler had a hard time providing specific figures.

¶47　Butler protests that, based on all this information, it should have been clear to Mediaport that he was seeking three times his Base Salary (rather than his annual salary), and that by "Base Salary" he intended the higher figure referred to in the Hubbard Letter. At a minimum, he asserts that these relatively minor factual distinctions should have been left for a factfinder to sort out. But Butler—like the plaintiff in *Keystone*— "misunderstands the burden placed on the plaintiff by rule 26." *See Keystone*, 2019 UT 20, ¶ 23. It is not Mediaport's responsibility to cull through the documents and attempt to divine what Butler's damages computations might be; it is Butler's responsibility to tell Mediaport what those computations are. It is only in those cases where the damages theories and computations are clean and simple, and in which the illuminating information is produced or obtained well in advance of the end of the fact discovery period, where we can say that a district court abused its discretion in concluding that an inadequate disclosure was not harmless. *See, e.g., Chard*, 2019 UT App 209, ¶¶ 43–46.

¶48　Our mention of the district court's discretion brings us, appropriately, back to the standard of review. We recognize that assessment of harm in this context is a nuanced matter, and that it is sometimes difficult to tell if a defendant has really been harmed or is just feigning harm for the purposes of trying to get the plaintiff's damages claims dismissed on non-merits grounds prior to trial. In this context, we recognize that a district court will almost always have a better vantage point than we do to make such a call; partly for this reason, we review a district

court's harmlessness determination for abuse of discretion. *See Keystone*, 2019 UT 20, ¶ 18. On this record, the district court determined that Butler had not borne his burden of demonstrating that his inadequate disclosures were harmless. In particular, the court concluded that Butler's faulty disclosures negatively impacted Mediaport's ability to defend the lawsuit, including its decisions about "allocating resources" during the discovery phase of the case. This decision, while perhaps not the only possible permissible decision under the circumstances, was not outside the bounds of the court's discretion.

¶49    We therefore affirm the district court's decision to grant Mediaport's motion in limine and consequently strike all of the evidence Butler planned to use to support his damages counterclaims. And given that Butler therefore had no evidence to support those counterclaims, we perceive no error in the court's decision to dismiss them summarily.

## II. Mediaport's Cross-Appeal

¶50    In its cross-appeal, Mediaport challenges the district court's determination that Mediaport was not entitled to recover the attorney fees it incurred in this litigation. The court determined that the Agreement, even assuming its validity, simply did not provide for recovery of attorney fees outside the arbitration context. We agree with the district court's assessment.

¶51    "In general, a party may recover attorney fees only when provided for by statute or contract—the so-called American Rule." *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 93, 372 P.3d 629. Here, although Mediaport does make mention of Utah's reciprocal attorney fees statute, *see* Utah Code Ann. § 78B-5-826, its attorney fees claims are grounded in the Agreement. We must therefore carefully examine the language of that document; after all, under the American rule, attorney fees "provided for by contract . . . are allowed only *in strict accordance* with the terms of

the contract." *Giusti v. Sterling Wentworth Corp.*, 2009 UT 2, ¶ 73, 201 P.3d 966 (emphasis added) (quotation simplified).

¶52　Here, there are only two sentences in the Agreement that deal with attorney fees, both of which appear in a paragraph captioned "Governing Law; Arbitration." The first such sentence states that "[a]ny dispute, controversy or questions arising under, out of, or relating to this Agreement . . . shall be referred for arbitration," which "shall be the exclusive and sole means of resolving any such dispute." The next relevant sentence states as follows: "*In connection with any arbitration*, the prevailing party shall be entitled to recover its costs and reasonable attorneys' fees in addition to other relief granted." (Emphasis added.)

¶53　Butler—at least now[5]—asserts that these provisions entitle the prevailing party to recover attorney fees only in an arbitration setting, and not in connection with litigation pursued in court. We agree that the plain language of the Agreement bears no other reasonable interpretation. The parties to the Agreement—assuming, as noted, but without deciding, that the Agreement is valid—chose language indicating that recovery of attorney fees would be available to the prevailing party in any dispute between them, but *only* if that dispute was resolved in an

---

5. Perhaps hedging his bet, Butler in his counterclaim asserted an entitlement to recover attorney fees pursuant to the Agreement, even though he filed that counterclaim in court and not before an arbitrator. Now, however, Butler reads the Agreement as the district court did, namely, providing for recovery of only those attorney fees incurred in arbitration. But we do not hold Butler's change of heart against him; indeed, had Butler prevailed before the district court, we suspect Mediaport would not be very eager to pay attorney fees incurred during the litigation and may well have taken a different position than it is taking now regarding the interpretation of the Agreement's attorney fees provision.

arbitration proceeding. The Agreement states that attorney fees are recoverable only "[i]n connection with any arbitration." Indeed, there is no mention of entitlement to recover attorney fees outside of the paragraph captioned "Arbitration."

¶54 Mediaport resists this conclusion by pointing out that Butler, by filing his counterclaim in court and proceeding in litigation, waived his right to arbitration. But even assuming the truth of that assertion, it is irrelevant to the question at hand; the Agreement still does not provide for recovery of fees in court-based litigation. Had either side filed this litigation in arbitration rather than in court, the prevailing party might very well have been entitled to recover fees, pursuant to either the terms of the Agreement or Utah's reciprocal attorney fees statute. *See* Utah Code Ann. § 78B-5-826; *see also Hooban v. Unicity Int'l, Inc.*, 2009 UT App 287, ¶ 10, 220 P.3d 485, *aff'd*, 2012 UT 40, 285 P.3d 766. But because neither side opted for arbitration, the Agreement simply does not provide for any party to recover attorney fees.

¶55 Mediaport further protests that, because it took the position that the Agreement was invalid, it could not have availed itself of an arbitration forum—and thereby invoked the attorney fees provision—without harming its position regarding the validity of the Agreement. Maybe so. But even assuming that Mediaport could not have elected arbitration on a provisional basis, the fact that Butler retained control of the operation of the attorney fees provision—by being able to choose litigation or arbitration—is not necessarily unfair and is merely a function of a plaintiff being able to play a significant role in defining the scope of litigation. *See Ramon v. Nebo School Dist.*, 2021 UT 30, ¶ 16, 493 P.3d 613 (referring to the claimant as "master of the complaint," and stating that our adversarial system of justice allows a plaintiff "the prerogative of identifying the claims or causes of action she seeks to sustain in court" (quotation simplified)).

¶56   Thus, because the plain language of the Agreement limits any recovery of attorney fees to those incurred in arbitration, the district court did not err in denying Mediaport's motion for attorney fees.

## CONCLUSION

¶57   The district court correctly determined that Butler's damages disclosures were insufficient, and did not abuse its discretion in determining that Butler had failed to demonstrate that his inadequate disclosures were harmless. Accordingly, the court did not err by entering summary judgment, for lack of evidence of damages, on all of Butler's damages counterclaims. And finally, the court correctly denied Mediaport's motion for recovery of attorney fees.

¶58   Affirmed.

————————