2025 UT App 3

## THE UTAH COURT OF APPEALS

MAURICE ROKOVITZ AND DAWN ROKOVITZ,
Appellants,
*v.*
MANLEY CONSTRUCTION LLC,
Appellee.

Opinion
No. 20230590-CA
Filed January 9, 2025

Fourth District Court, Spanish Fork Department
The Honorable Jared Eldridge
No. 180300200

Bryan H. Booth, Attorney for Appellants

Stephen W. Whiting, Attorney for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and
DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1 Maurice and Dawn Rokovitz (the Rokovitzes) hired Manley Construction LLC (Manley) to build a custom home. As it turned out, the home ended up costing more than anticipated, and after completion of construction, certain disputes arose between the parties regarding costs and the quality of the work. Each side sued the other, and after a bench trial, the court dismissed parts of the Rokovitzes' breach of contract claim as "unpled" and entered a net judgment for $38,098.76 in favor of Manley. The Rokovitzes appeal from that judgment and raise several related challenges, largely centered around the trial court's dismissal of parts of their contract claim as "unpled."

¶2     We agree with the Rokovitzes that the trial court erred by dismissing parts of their contract claim for pleading-related reasons. We therefore reverse the court's orders of dismissal, vacate the court's judgment, and remand the case for further proceedings consistent with this opinion.

BACKGROUND[1]

¶3     In 2017, the Rokovitzes wanted to build their "dream home" on a lot they had purchased in Woodland Hills, Utah. They hired an architectural firm and an engineering firm to create architectural plans and a site plan (the Plans), and they reached out to several contractors to obtain construction bids. The initial bids were much higher than the Rokovitzes anticipated: one was for $550,000 and another was for $525,000.

¶4     The Rokovitzes also reached out to Manley, whom they had heard of through a mutual friend. Manley's principal understood that the Rokovitzes "had been talking about this dream home of theirs" and had been "struggl[ing] to find anybody that could" build it "within their budget." Manley gave the Rokovitzes an ostensibly tentative "verbal price estimate" that fit within their budget, and Manley began to reach out to subcontractors to finalize the bid. But the subcontractor bids came back "much more expensive than" Manley had "estimated in the discussion" with the Rokovitzes, and Manley adjusted its first official bid upward to $534,000 to meet these realities.

_____

1. "On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard and only present conflicting evidence to the extent necessary to clarify the issues raised on appeal." *Huck v. Ken's House LLC*, 2022 UT App 64, n.1, 511 P.3d 1220 (quotation simplified).

¶5    This price was apparently not within the Rokovitzes' budget, so Manley and the Rokovitzes engaged in negotiations to try to bring the price down. For one thing, the Rokovitzes agreed to do significant work on the home themselves—a concept the parties refer to as "sweat equity"—including site cleaning, tree removal, and low-voltage electrical work. The Rokovitzes also agreed to "reduce the size of the house by a little bit." And the parties agreed to exclude from the bid certain outdoor items that were shown on the Plans, such as "the detached garage, the rock wall, [the] driveway, [and the] landscaping." Manley's principal later testified, "We agreed that we were only doing the house." Using these methods, Manley lowered its bid to $443,800, and the parties eventually memorialized that amount in a written contract, executed in November 2017 and captioned "Residential Construction Agreement" (the Contract). As relevant to this appeal, the Contract contained the following clauses:

- **"Scope of Work" and "Warranty" Clauses.** In these sections, Manley agreed "to construct" the home "in accordance with the [Plans]" and promised to "provide all services, materials and labor for such work." However, the Contract limited Manley's responsibility to "the construction of the residential structure, unless specifically agreed to in writing." And the parties agreed that the Contract "expressly excludes the detached garage, landscaping and any landscaping/retaining rock." For the work performed, Manley warranted "all aspects of [its] workmanship and materials for 1 year."

- **"Costs" and "Change Order" Clauses.** Through these clauses, the parties agreed that the "total project cost" was not to "exceed $443,800 unless modified by written Change Orders" signed by both sides. A separate "Change Order" clause specified that the Rokovitzes could "make changes to the scope of the work from time to time during the term of" the Contract but that "any such change or modification

shall only be made in a written Change Order which is signed and dated by both parties" and that the Rokovitzes would "pay any increase in the cost" of the home resulting from any change order. Appended to the Contract as "Exhibit A" was a document entitled "Cost Breakdown." The Cost Breakdown included a table with fifty-one line items—one of which was a $38,615.31 "Management Fee"—that added up to exactly $443,800. Excluded from the Cost Breakdown were certain tasks that the Rokovitzes had apparently agreed to do as "sweat equity," such as tree removal and cleaning.

¶6    After the Contract was signed, construction commenced. During construction, the parties mutually signed five written change orders, increasing the cost of the home by more than $28,000. In addition to those five written change orders, the Rokovitzes apparently directly asked some of the subcontractors to undertake extra work; indeed, the trial court later found that the Rokovitzes "requested upgrades beyond what was planned" and that they did so "without consulting or notifying Manley." The Rokovitzes ended up having quite a bit of direct contact with the subcontractors; one testified at trial that the Rokovitzes were "much more hands-on" than most homeowners and that they— rather than Manley, the general contractor—were the ones who were "making the decisions about how much would be spent improving" the home. Another testified at trial that the Rokovitzes were the ones "request[ing] all of the bids" and interfacing with the subcontractors. But much of this additional work was never memorialized in written change orders. When the construction was finished, the total cost of the home had ballooned to more than $572,000, nearly $130,000 more than the original bid price and about $100,000 more than the bid price plus the costs reflected in the five written change orders. In addition, the Rokovitzes also came to believe that some of the construction work performed on the home was defective.

¶7 In December 2018, the Rokovitzes filed suit against Manley.[2] Their complaint contained two causes of action: for breach of contract and for declaratory relief. Therein, the Rokovitzes specifically alleged that Manley breached the Contract "by, *among other things*, failing to pay or reduce the amount owed to subcontractors by $18,256.00, failing to pay liquidated damages for delays in completion, failing to pay their portion of all overages, and failing to complete" certain items. (Emphasis added.) The complaint was labeled "Tier 1," and sought just over $30,000 in damages for breach of contract.

¶8 A few weeks later, Manley responded to the complaint. It did not file a motion to dismiss or other motion asserting any pleading deficiencies; instead, it answered the Rokovitzes' complaint and denied any liability under the Contract, and it filed a counterclaim against the Rokovitzes, asserting that they had "constantly . . . tried to micromanage" the construction of the home, had "fired" certain subcontractors and hired some of their own, and had made "many requests for changes" and "upgrades" to the home, all of which had resulted in cost overruns and delays. In addition, Manley alleged that many of the subcontractors involved in the Rokovitz project now "refused to work with" Manley on future projects "because of their experiences trying to deal with" the Rokovitzes on this project. In the counterclaim, Manley stated causes of action for (1) breach of contract, (2) unjust enrichment, and (3) breach of the implied covenant of good faith and fair dealing.[3] On its contract claim, Manley did not request

---

2. The Rokovitzes also included two of Manley's principals as named defendants in their lawsuit. But the trial court dismissed the Rokovitzes' claims against the individual defendants, and the Rokovitzes do not appeal that decision.

3. Manley also included claims for defamation and intentional interference with economic relations, but it later agreed to dismiss those claims, which are not at issue in this appeal.

any specific amount of damages, nor did it list specific damages categories or items; instead, it simply requested "an amount not less than $50,000" in damages.

¶9 A scheduling order was put into place that, as amended, set July 31, 2020 as the deadline for completion of all fact discovery. The parties exchanged initial disclosures and certain supplementations, with each party providing additional information about their claimed damages. In their initial disclosures, the Rokovitzes indicated—as set forth in their complaint—that they were seeking only about $30,000 in damages. But over time, the Rokovitzes served several supplemental disclosures, providing information about new categories of damages and gradually increasing the amount they intended to seek. In their third supplemental disclosures, submitted just after the close of fact discovery but before the close of expert discovery, the Rokovitzes indicated that they were seeking a net judgment of $335,016.16, about ten times the amount they had mentioned in their complaint. In particular, they indicated their belief that they were entitled to over $27,000 of "sweat equity" damages and to another $148,000 in damages for "unfinished work" and "defective work." And they identified numerous witnesses and documents that they intended to use to support these damages claims. Manley made no objection to the Rokovitzes' first, second, or third supplemental disclosures.

¶10 In April 2021, after the close of expert discovery, the Rokovitzes tried one more time—a fourth time—to supplement their initial disclosures to state a different damages amount and to introduce a new damages category (for "delay damages and loan costs") and new supporting documents. This time, Manley objected, asserting that these disclosures introduced new matters into the litigation at a late date and would cause delay and prejudice to Manley. The court sustained Manley's objection, concluding that the Rokovitzes' fourth supplemental initial disclosures were "untimely" and that the Rokovitzes had not

demonstrated good cause or harmlessness. The court thus refused to allow the Rokovitzes to make a fourth supplementation to their initial disclosures.

¶11 As the matter approached the scheduled trial date, two notable motions were filed. First, the Rokovitzes filed a motion to amend their complaint to revise the "discovery tier": in light of the damages figure listed in their third supplemental disclosures, they wanted to change the complaint from "Tier 1" to "Tier 3." Second, Manley filed a "motion in limine," asserting that the Rokovitzes were seeking "to prove claims that [were] not specified in the complaint," and asking the court to exclude the Rokovitzes' "documents and witness testimony on issues of construction defects, overcharges, or other claims for damages not specified in the complaint." In opposing the motion in limine, the Rokovitzes argued that the fact that they hadn't mentioned some of their later-disclosed damages categories in their complaint was not problematic, because a complaint for damages "is sufficient if it simply demands relief in the form of damages"; indeed, they asserted that "[t]he amount of damages sought must be disclosed in initial and supplemental disclosures" and "need not be included in the complaint."

¶12 The trial court entertained oral argument on both motions in the same hearing, and it issued an oral ruling partially granting both motions. The court allowed the Rokovitzes to change their complaint from Tier 1 to Tier 2, but it refused to allow them to change it to Tier 3, and it ruled that the Rokovitzes "may not assert any claims for damages resulting from construction defects" because "the original complaint did not assert damages from construction defects." For similar reasons, the court partially granted Manley's motion in limine, ruling that the Rokovitzes could not "present at trial any documents or witness testimony regarding . . . construction defects." But the court denied Manley's motion in all other respects, stating that the Rokovitzes were "not prevented from presenting documents or witness testimony

regarding overcharges, incomplete work, or unperformed work." Following this ruling, the Rokovitzes filed an amended complaint, labeled "Tier 2," stating that they were seeking damages up to $300,000.

¶13 The case then proceeded to a bench trial, which spanned parts of six days in June and July 2022 and included testimony from nineteen witnesses. The Rokovitzes took the position that the Contract required Manley to construct "everything on the [Plans]" that wasn't expressly excluded in the Contract, and that Manley was required to do that work for a "$443,800 fixed price" plus the amounts set forth in the five written change orders. Maurice Rokovitz testified that, in his view, this was "an all-inclusive project" that "would include everything" for that price. In addition, the Rokovitzes took the position that Manley had failed to construct the home as depicted on the Plans and that Manley had "omitted" certain work that the Rokovitzes believed the Contract required it to perform. During the trial, the Rokovitzes called multiple witnesses to testify about how much they would charge to complete this unperformed, or omitted, work. And they submitted a summary document—admitted as "Exhibit 4" at trial—that tabulated all of this "omitted work," which the Rokovitzes claimed totaled just over $100,000. Finally, the Rokovitzes presented evidence regarding the "sweat equity" they put into the home. According to an exhibit admitted at trial, the Rokovitzes performed work valued at just over $25,000. In total, as they computed it, Manley owed them nearly $227,000—the difference between the total amount the Rokovitzes had paid Manley (some $572,000) and the amount the Rokovitzes believed they were contractually required to pay (some $345,000) after accounting for the omitted work and their sweat equity.

¶14 Manley took an entirely different position regarding interpretation of the Contract and regarding amounts owed. In Manley's view, it was obligated only to construct the residence, but nothing outside, and it was obligated to do so as per the Cost

Breakdown that the parties had attached as Exhibit A to the Contract. And Manley believed that any additions to the work required by the terms of the Contract needed to be agreed upon by both parties and reflected in a written change order. Manley presented evidence at trial—through its principal's testimony and that of several subcontractors—indicating that Maurice Rokovitz exercised an unusual amount of control over the details of the project, often communicating directly with subcontractors and asking them—without a written change order and without Manley's agreement—to perform additional or more expensive work than originally contemplated. Also, Maurice Rokovitz acknowledged in his testimony that the Rokovitzes had paid Manley only a portion of its 10% management fee, an item that was listed on the Cost Breakdown.

¶15    At the conclusion of the trial, the court took the matter under advisement, and several weeks later it issued a written ruling containing findings of fact and conclusions of law. In it, the court looked to the Rokovitzes' complaint to determine the scope of the damages available to them. Using the complaint as its template, the court considered the merits of only those discrete damages items that it believed the Rokovitzes had specifically enumerated in their complaint; it ruled that "the other items listed on [the Rokovitzes'] Exhibit 4" and discussed at trial—including most of their claimed "omitted work"—"were not properly pleaded in the Amended Complaint in a way that gave [Manley] fair notice of the nature and basis of the claim asserted and a general indication of the type of litigation involved." With regard to the claims the court believed had been properly pleaded, the court found that the Rokovitzes, on their affirmative claims, were entitled to recover $1,810, which included $1,160 for "sweat equity" for tree removal and $650 for a necessary repair item.

¶16    In determining the amount of damages to which Manley was entitled on its counterclaim, however, the court took a different approach: it looked to the Contract and to the evidence

Manley introduced at trial, and not to the specifics (or lack of same) of Manley's pleading. In particular, the court found that the Rokovitzes had admitted, during trial, that they did not pay a significant part—more than $25,000—of the management fee to which Manley was entitled. The court stated generally that there was "no dispute that [the Cost Breakdown] also sets out the anticipated cost breakdown for the construction of the Rokovitz home." Reasoning from this premise, the court determined that the Rokovitzes were required to pay the management fee because that fee was specifically listed in the Cost Breakdown. The court also determined that Manley was entitled to recover two other minor items of damage. In total, the court concluded that Manley was entitled to recover $28,634.94 on its counterclaim.

¶17 At no point, however, did the court directly engage with the overarching contractual dispute between the parties, namely, whether the Cost Breakdown limits the scope of Manley's required work, or whether the Contract required Manley to build the home as per the Plans, regardless of the ultimate cost. In particular, the court did not expressly analyze whether the Contract might be ambiguous on that point or, if so, what the extrinsic evidence showed regarding the Contract's meaning.

¶18 The court offset the Rokovitzes' damages against Manley's damages, and it determined that Manley was entitled to a net judgment of $26,824.94. Later, after adding interest, the court entered a total judgment in Manley's favor in the amount of $38,098.76.

¶19 After entry of judgment, the Rokovitzes filed a motion asking the court to amend its findings and the judgment. In that motion, the Rokovitzes asserted that the court had "failed to account for the Rokovitzes' significant overpayment" above the price indicated in the Contract. They also argued that the court had erred by refusing to consider—on pleading grounds—many of the Rokovitzes' claims for "omitted work." And they claimed

that the court had failed to award them "sweat equity" damages for certain items. After holding oral argument, the court made an oral ruling—later memorialized in a two-page written order—denying the motion. In that order, the court again resorted to a review of the Rokovitzes' complaint, stating that "[t]he Amended Complaint does not provide notice of a claim against [Manley] for the amounts above the alleged 'total cost' of" the Contract. But the court also ruled that the Rokovitzes were not "entitled to recover those amounts" in any event, because "the burden to provide change orders was mutually the responsibility of [the Rokovitzes] and Manley," and the Rokovitzes waived their "right to receive change orders" by "request[ing] extra work" or "changes without consulting or notifying Manley." In short, the court ruled that the Rokovitzes were "responsible for upgrades causing increased costs" and that they "retained the benefit of those upgrades."

ISSUES AND STANDARDS OF REVIEW

¶20     The Rokovitzes now appeal, and they challenge several of the trial court's rulings. First, they take issue with the court's dismissal of—or refusal to award—two components of their claimed breach of contract damages on the basis that those damages weren't properly pleaded. This issue is largely one of rule interpretation, and on such claims we afford no deference to the trial court's rulings, reviewing them for correctness. *Griffin v. Snow Christensen & Martineau*, 2020 UT 33, ¶ 7, 467 P.3d 833 ("We review a [trial] court's interpretation of our rules of civil procedure for correctness." (quotation simplified)); *see also Zubiate v. American Family Ins. Co.*, 2022 UT App 144, ¶ 9, 524 P.3d 148 (reviewing the dismissal of a complaint for correctness).

¶21     Second, the Rokovitzes take issue with the trial court's (at most implicit) ruling that Manley's obligations under the Contract were limited to those items listed in the Cost Breakdown. Our standard of review of a court's contractual interpretation rulings varies depending on which stage of the analysis we are reviewing.

A decision about whether a contract is ambiguous is reviewed for correctness. *See Watkins v. Ford*, 2013 UT 31, ¶ 19, 304 P.3d 841 ("Whether a contract is ambiguous is a question of law, which we review for correctness." (quotation simplified)). An interpretation of an unambiguous contract is also reviewed for correctness. *See Brady v. Park*, 2019 UT 16, ¶ 29, 445 P.3d 395. "But if a contract term is ambiguous, [trial] courts should consider extrinsic evidence to resolve the ambiguity," and a court's "determination of the parties' intent after considering extrinsic evidence . . . is a factual determination to which we grant deference" and "should be overturned only if clearly erroneous." *Id.*[4]

## ANALYSIS

### I. Dismissal of "Unpled" Damages

¶22 The Rokovitzes' first challenge concerns the trial court's dismissal of—or failure to award—two components of their claimed damages, on the basis that such damages were not identified and specifically pleaded in the Rokovitzes' complaint. First, they take issue with the court's pretrial ruling, made in connection with Manley's motion in limine, refusing to allow the Rokovitzes to "assert any claims for damages resulting from construction defects" because their "original complaint did not assert damages from construction defects." Second, they take issue with the court's post-trial ruling refusing to award most of their claimed damages for "omitted work" because those

---

4. The Rokovitzes raise two other challenges that are related to their overarching complaint about the trial court's interpretation of the Contract: they assert that the court "failed to account for" their "significant overpayment" and that the court "erred in concluding that [they] waived their right to require signed change orders." But because we remand this case for clarification on the overarching contractual interpretation issue, we need not delve, at this time, into the specifics of these related challenges.

damages "were not properly pled" in the Rokovitzes' complaint. The Rokovitzes assign error to these rulings, asserting that they were not required to specifically plead, in their complaint, categories and amounts of damages related to their breach of contract claim, and asserting that they properly disclosed these categories and amounts of damages in their supplemental disclosures. We agree with the Rokovitzes that the court's rulings were erroneous.

¶23 As we read the record, the source of the court's error was its apparent misunderstanding of the different requirements imposed by, on the one hand, the rules governing the *pleading* of a damages claim and, on the other hand, the rules governing the *initial and supplemental disclosure* of information relevant to a damages claim. Generally speaking, the rules governing the pleading of a damages claim do not require all that much, while the rules governing the disclosure of relevant damages information require a great deal more. As we explain, the Rokovitzes complied with both the relevant pleading requirements as well as the relevant disclosure requirements, and thus there existed no basis for pleading- or disclosure-related dismissal of these components of their claimed damages associated with their breach of contract cause of action.

¶24 The relevant pleading requirements are found in rule 8 of the Utah Rules of Civil Procedure. Utah, like most jurisdictions, has adopted principles of "notice pleading," *see Mack v. Utah State Dep't of Com.*, 2009 UT 47, ¶ 17, 221 P.3d 194, and under our rules all that is required at the pleading stage is "a short and plain . . . statement of the claim showing that the party is entitled to relief" and a "demand for judgment for specified relief," Utah R. Civ. P. 8(a). Moreover, when considering the adequacy of pleadings, "courts are to liberally construe both rules 8 and 12 to favor finding a pleading sufficient." *Mack*, 2009 UT 47, ¶ 17. "Indeed, even if a complaint is vague, inartfully drafted, a bare-bones outline or not a model of specificity, the complaint may still be

adequate so long as it can reasonably be read as supporting a claim for relief, giving the defendant notice of that claim." *Zubiate v. American Family Ins. Co.*, 2022 UT App 144, ¶ 14, 524 P.3d 148 (quotation simplified). "A plaintiff's complaint will be deemed adequate under this standard as long as the defendant knows what is being claimed and how to defend against it." *Id.* ¶ 11 (quotation simplified); *see also Southern Utah Wilderness All. v. Kane County Comm'n*, 2021 UT 7, ¶ 51, 484 P.3d 1146 ("Pleadings are sufficient where they give fair notice of the nature and basis of the claim asserted and a general indication of the type of litigation involved." (quotation simplified)).

¶25 Rule 8 expressly does not require parties to plead a specific *amount* of damages. *See* Utah R. Civ. P. 8(a) (referring to complaints that do "not plead an amount" of damages). Indeed, there are only two basic pleading requirements when it comes to damages. First, a party must indicate that it is seeking damages as a general category of relief (as opposed to another kind of relief, like an injunction or declaration). *See id.* (requiring a "demand for judgment for specified relief"). And second, the party must specify which discovery tier the case fits into, an exercise that requires the party to at least implicitly estimate the amount of damages it is seeking. *See id.* ("A party who claims damages but does not plead an amount must plead that the damages are such as to qualify for a specified tier defined by Rule 26(c)(3).").

¶26 The Rokovitzes' complaints—both their initial one and their amended one—met these basic requirements. In each complaint, they indicated that they were seeking monetary damages as one form of requested relief for the breaches of contract they believed Manley had committed. And in each complaint, they specified which discovery tier the case fell into; in their initial complaint, they called for Tier 1 damages, and in their amended complaint—after the court refused to allow them to request Tier 3 damages—they called for Tier 2 damages. Nothing more is required, and there was therefore no basis for the court to

dismiss—or refuse to award—particular components of damages simply because they were not listed or enumerated in the Rokovitzes' complaints.

¶27   Simply put, rule 8 does not require parties to include additional details in their complaint regarding categories or amounts of damages. And parties should not be penalized—as the Rokovitzes eventually were here—for attempting to include in their complaints additional (but not required) information about the damages they seek. For instance, in this case the Rokovitzes, in their original complaint, offered a specific damages amount, including several categories of damages, and showed their work regarding computation of that amount. Such information should be viewed as potentially helpful bonus material that parties ought not be discouraged from providing. And rulings like the one the court made here—limiting the Rokovitzes to precisely those types and categories of damages specifically enumerated in the complaint, even though they weren't required to list any and even though they indicated that the listed categories were "among other things"—will certainly have the effect of discouraging parties from providing any more than the bare minimum required.

¶28   There is, of course, a time and a place where the rules require parties to get specific about the damages they seek: during the disclosure and discovery phase of the litigation. While the pleading-related rules are quite liberal and don't require all that much, the disclosure-related rules, by contrast, are strict and require parties, at the risk of stiff penalties for noncompliance, to provide significant information. Those rules "require parties, at the outset of their involvement in litigation, to provide certain disclosures to their litigation opponents," and parties "must do so without waiting for a discovery request." *Butler v. Mediaport Ent. Inc.*, 2022 UT App 37, ¶ 20, 508 P.3d 619 (quotation simplified); *see also* Utah R. Civ. P. 26(a)(1).

¶29 With respect to damages, the disclosure rules require parties to provide their opponents with "a computation of any damages claimed and a copy of all discoverable documents or evidentiary material on which such computation is based." Utah R. Civ. P. 26(a)(1)(C). The rules recognize "that parties may not know, at the outset of a case, exactly what their damages amount to, and that damages often require additional discovery." *Butler*, 2022 UT App 37, ¶ 20 (quotation simplified). But while the rules may not require disclosure of "a to-the-penny calculation" at the outset of every case, they do "require, at a minimum, a disclosure that damages are in fact being claimed, the categories of any such damages, and a description of the method by which the party intends to compute those damages." *Id.* ¶¶ 20, 22. Moreover, the rules require parties to "timely serve" updated disclosure information if they "learn[] that a disclosure or response is incomplete or incorrect in some important way." *See* Utah R. Civ. P. 26(d)(5). Thus, "parties who do not possess enough information at the outset of a case to provide complete damages disclosures must supplement those disclosures as soon as they discover the information needed to complete the computation." *Butler*, 2022 UT App 37, ¶ 21.

¶30 The penalties for noncompliance with disclosure requirements are significant: "If a party fails to disclose or to supplement timely a disclosure, that party may not use the undisclosed witness, document, or material at any hearing or trial unless the failure is harmless or the party shows good cause for the failure." Utah R. Civ. P. 26(d)(4). These penalties are "automatic and mandatory when the prerequisites are met," and courts "should, upon request, presumptively impose sanctions for noncompliance unless the party seeking relief from disclosure requirements can demonstrate that its noncompliance was harmless or excused by good cause." *Bailey v. Bailey*, 2024 UT App 51, ¶ 25, 548 P.3d 519 (quotation simplified).

¶31　In this case, the Rokovitzes timely made their initial disclosures, and then they supplemented those disclosures three times without drawing any objection from Manley. Those disclosures—especially the third supplemental disclosures—indicated a significant increase in the amount of damages the Rokovitzes were seeking: while their initial disclosures indicated that they were seeking only about $30,000 in damages, the third supplemental disclosures indicated a tenfold increase, to $335,016.16. And the supplemental disclosures contained a detailed breakdown of how that figure was derived, including a list of various categories of claimed damages, such as "sweat equity," "unfinished work," and "defective work." Those disclosures also referred Manley to over 1,200 pages of documents that the Rokovitzes asserted supported their damages calculations. And as noted, Manley never lodged an objection to the Rokovitzes' third supplemental disclosures, whether on the basis of timeliness or as to their substance. Manley certainly knew how to do so, as evidenced by its successful objection to the Rokovitzes' later (fourth) attempt to supplement their damages disclosures. Thus, the damages claimed in the Rokovitzes' third supplemental disclosures—including damages for omitted work and construction defects—must be considered timely and properly disclosed; indeed, the trial court appeared to implicitly acknowledge the propriety of the Rokovitzes' third supplemental disclosures in its motion in limine ruling, in which it determined that the Rokovitzes would not be "prevented from presenting documents or witness testimony [at trial] regarding overcharges, incomplete work, or unperformed work."

¶32　With these background facts and principles in mind, it becomes apparent that there exists no procedural basis for the court's ruling dismissing—or refusing to award—the Rokovitzes' claims for construction defect and omitted work damages. The Rokovitzes sufficiently pleaded damages for breach of contract in their two complaints; those documents did not need to contain specific details about the various categories of contract damages

the Rokovitzes might seek, such as construction defect damages or omitted work damages. And later, the Rokovitzes sufficiently disclosed those specific categories of damages to Manley, along with amounts, computations, and supporting documentation.

¶33    Those two specific components of the Rokovitzes' breach of contract claim may or may not have merit, on their substance. But the trial court erred by dismissing—or refusing to award—them on procedural grounds related to the manner in which the Rokovitzes had pleaded their damages in their complaints. We therefore reverse the trial court's rulings to that effect, vacate the court's judgment, and remand the matter to the trial court so that those components of the Rokovitzes' breach of contract claim might be evaluated on their merits.[5]

## II. Contractual Interpretation

¶34    The Rokovitzes' second challenge is to the trial court's ruling—certainly not made expressly, but in the Rokovitzes' view made implicitly—that "the scope of work under [the Contract] was limited to the specific items identified in the attached Cost Breakdown." To the extent that the court made such a ruling, its basis is far from apparent, and because of that we are unsure which standard of review to apply to the court's ruling.

---

5. Manley raises several arguments that were not discussed or ruled upon at the trial court level, and it invites us to affirm the trial court's rulings on one of these proffered alternative grounds. For instance, it raises equitable estoppel, unclean hands, and the first-breach rule. While it is true that we have the discretion to affirm a trial court's decision "on any legal ground or theory apparent on the record," *see Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158 (quotation simplified), we decline to exercise that discretion here. Of course, the parties remain free to raise these and other legal arguments on remand.

Accordingly, we are unable to effectively review that ruling, and we must remand the matter to the trial court for clarification.

¶35 In this case, the parties came to trial espousing diametrically opposed views regarding the scope of the work that the Contract required Manley to perform. The Rokovitzes believed that the Contract required Manley to build their home according to the Plans, except the items specifically excluded in the Contract, for a flat fee of $443,800 plus any amounts added by written and agreed-upon change orders. Manley, by contrast, believed that the Contract required it to perform the work specifically set forth in the Cost Breakdown, attached to the Contract as Exhibit A, plus any work added by written and agreed-upon change orders. Thus, one of the chief foundational tasks that the trial court was called upon to undertake in this case was to decide which interpretation of the Contract was correct.

¶36 In a situation like this, courts should begin the analysis by assessing whether the relevant instrument is ambiguous; the answer to that question will inform the remainder of the court's analysis, and it will also inform our standard of review on appeal. "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Brady v. Park*, 2019 UT 16, ¶ 53, 445 P.3d 395 (quotation simplified); *see also Ocean 18 LLC v. Overage Refund Specialists LLC (In re Excess Proceeds from Foreclosure of 1107 Snowberry St.)*, 2020 UT App 54, ¶ 22, 474 P.3d 481 ("In many cases, we need look no further than the plain language of the contract, because that language may unambiguously tell us what the parties intended."). "But where a contractual term or provision is ambiguous as to what the parties intended, the question becomes a question of fact to be determined by the fact-finder." *Brady*, 2019 UT 16, ¶ 53. And in that situation, the trial court must consider extrinsic evidence of the parties' intentions and must make an ultimate factual finding, based on that

evidence, about what the contract means. *See Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994 (stating that "if the parties' intentions cannot be determined from the face of the contract," courts must move to a second step and "extrinsic evidence must be looked to in order to determine the intentions of the parties" (quotation simplified)). And we have already noted that we review a trial court's interpretation of an unambiguous contract for correctness, but we review deferentially a trial court's findings regarding the meaning of an ambiguous contract. *See supra* ¶ 21.

¶37    In this case, the trial court never engaged with the question of whether the Contract's scope-of-work provisions are ambiguous. We simply do not know what the trial court thought on that point. And this is problematic from an appellate procedure perspective, because without a ruling from the trial court on ambiguity, we are unable to ascertain the correct standard of review, which in turn renders us unable to meaningfully review the court's ultimate interpretation of the Contract. We must therefore remand the case to the trial court so that the court can provide additional input regarding its interpretation of the Contract. And the court should begin that analysis by making an express determination about whether the Contract's scope-of-work provisions are ambiguous.

¶38    "A contract is facially ambiguous if its terms are capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Mind & Motion Utah Invs.*, 2016 UT 6, ¶ 24, (quotation simplified). A "reasonable interpretation" is one "that cannot be ruled out, after considering the natural meaning of the words in the contract provision in context of the contract as a whole, as one the parties could have reasonably intended." *Brady*, 2019 UT 16, ¶ 55. Crucially, ambiguity is present only if *both* proffered interpretations of the contract's language are "tenable" and in keeping with the contract's language. *See R & R Energies v. Mother*

*Earth Indus.*, 936 P.2d 1068, 1074 (Utah 1997) (stating that a contract "is not necessarily ambiguous just because one party gives [a] provision a different meaning than another party does," but instead, "the contrary positions of the parties must each be tenable" (quotation simplified)); *see also Brady*, 2019 UT 16, ¶ 55 (stating that if "either of the competing interpretations could reasonably have been what the parties intended when they entered into the contract, then the contract is ambiguous"). A contract containing terms that are "in irreconcilable conflict" and cannot be harmonized is ambiguous. *See American Bonding Co. v. Nelson*, 763 P.2d 814, 816 (Utah Ct. App. 1988). On remand, the trial court should consider whether the competing interpretations proffered by each side are tenable and, concomitantly, whether the Contract is ambiguous.

¶39 If the court determines that the Contract's scope-of-work provisions are not ambiguous, it should interpret the Contract based on its plain language. Any such ruling would then be reviewed for correctness, without deference to the trial court. But if the court determines that the Contract's scope-of-work provisions are ambiguous, then it must consider extrinsic evidence of the parties' intentions, including the negotiators' testimony about what they meant, and including course-of-dealing evidence, contemporaneous documents, and other forms of relevant evidence. If necessary, the court should make credibility findings. And based on all that evidence, it should then make findings about what the Contract's scope-of-work provisions require; any such ruling would then be reviewed deferentially. Either way, though, the court should make an express ruling regarding interpretation of the Contract,

something not contained in either of its post-trial rulings.[6] In particular, the court should indicate whether it believes the Contract required Manley to construct the home as per the Plans for a flat fee, as the Rokovitzes assert, or whether the Contract required Manley to perform only those tasks enumerated in the Cost Breakdown.

CONCLUSION

¶40 The trial court erred by dismissing—or refusing to award damages for—certain components of the Rokovitzes' claim for breach of contract, based on its belief that those damages were not properly pleaded. The Rokovitzes' pleadings complied with rule 8's lenient requirements, and the Rokovitzes later disclosed—without objection—the very components of damages that the court refused to consider. We therefore reverse the court's rulings regarding these damages items and, on this basis alone, we vacate

---

6. The court arguably made an *implicit* ruling in this regard: reading between the lines of the court's first post-trial ruling, one might draw an inference that the court aligned itself with Manley's interpretation of the Contract. The court made many references to the Cost Breakdown and appeared, at times, to view that document as at least *a* basis for determining the scope of Manley's obligations under the Contract; for instance, it rejected some of the Rokovitzes' "sweat equity" items by stating that they were "not a budget item included in the Cost Breakdown" and therefore were "not part of the $443,800 contract price." And the Rokovitzes, in their appellate briefs, operate from the assumption that the court did in fact "conclud[e] that the scope of work is limited to the specific items identified in" the Cost Breakdown. But as noted, the court did not ever make an express ruling on that point, a deficiency that clouds the standard of review and prevents us from meaningfully reviewing any such decision.

the court's judgment and remand the case to the trial court so that it can consider these damages components on their merits.

¶41    On remand, the court should also deal directly with the overarching contract interpretation dispute between the parties, and it should make express rulings about whether the Contract's scope-of-work provisions are ambiguous and about which of the two competing interpretations of those provisions is correct.

¶42    Vacated and remanded.

_____