**2026 UT App 71**

## THE UTAH COURT OF APPEALS

IN THE MATTER OF THE MAUD WOOD BROWN FAMILY LIVING TRUST

KATHRIN S. BROCK,
Appellant,
*v.*
MARILYN B. LAWSON,
Appellee.

Opinion
No. 20240002-CA
Filed May 7, 2026

Sixth District Court, Kanab Department
The Honorable Alex Goble
No. 213600038

James L. Spendlove, Attorney for Appellant

Bryan J. Pattison and M. Sean Sullivan,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES GREGORY K. ORME and AMY J. OLIVER concurred.

LUTHY, Judge:

¶1     Marilyn B. Lawson and Kathrin S. Brock are co-trustees of a trust created by their mother, Maud Wood Brown. Maud's[1] six children are the beneficiaries of the trust. Following Maud's death, conflicts regarding the trust and other matters arose, and litigation ensued.

---

1. Maud, her children, and their spouses each share a last name with at least one other person involved in this case; therefore, we refer to Maud, the siblings, and their spouses by their given names, with no disrespect intended by the informality.

¶2　Eventually, the six siblings and the respective husbands of two of them entered a settlement agreement. Kathrin and the other siblings on her side of the dispute refused to perform the agreement, contending that conditions to their performance had not occurred. Marilyn and the other siblings on her side of the dispute asserted that any conditions had been fulfilled, and Marilyn moved the district court for an order enforcing the agreement. The district court interpreted three provisions of the agreement and concluded that they contain a condition precedent but that the condition was fulfilled. Thus, it issued an order enforcing the agreement as interpreted and awarding Marilyn attorney fees under the agreement. Kathrin now appeals.

¶3　We conclude that the settlement agreement contains two conditions, neither of which have been fulfilled. Accordingly, we reverse the court's order enforcing the agreement, and we vacate the award of attorney fees to Marilyn. We remand the matter to the district court for such proceedings as may now be appropriate.

## BACKGROUND

### *The Trust*

¶4　Maud and her husband had six children: Norris, Worth, Elaine, Marilyn, Pearl Ann, and Kathrin. In 1981, Maud created The Maud Wood Brown Family Living Trust (the Trust), naming her husband as trustee and her six children as beneficiaries. After her husband's death in 1992, Maud eventually named Kathrin and Marilyn as co-trustees of the Trust. Maud died in 2019. At the time of her death, the Trust's assets included real property, tangible items of personal property, multiple bank and credit union accounts, stock in an irrigation company, an individual retirement account, and a majority interest in Vermillion View, LLC (Vermillion View).

*Vermillion View*

¶5     Vermillion View was created in 2006 by the Trust, through its co-trustees, Marilyn and Kathrin, who were named the managers of Vermillion View. The company's assets include various parcels of real property, water rights, and irrigation company stock, all apparently separate from the property that the Trust owns directly. Under the terms of the company's operating agreement (the Operating Agreement) and as relevant here, only "descendants of [Maud] and their spouses"—or a trust of which such a person is a beneficiary—can hold an ownership interest in Vermillion View. The Trust itself owns roughly 96.5% of Vermillion View. Maud's children, most of their spouses,[2] and Maud's seven grandchildren each own some fraction of a percent of Vermillion View, with their combined ownership totaling roughly 3.5%. The Operating Agreement provides that except in circumstances not applicable here, Vermillion View "may be dissolved only . . . upon unanimous written agreement of all Members and all Managers" of the company.

*The Fredonia Property*

¶6     Apart from the Trust and Vermillion View, each of Maud's six children—with his or her spouse—owns an undivided one-sixth interest in two parcels of real property in Fredonia, Arizona (Parcel 1 and Parcel 2; collectively, the Fredonia Property).[3]

*The Dispute and the Mediation Agreement*

¶7     Following Maud's death, disputes arose between the co-trustees regarding administration of the Trust and other matters.

---

2. Pearl Ann's husband, Tom, is not an owner of Vermillion View.

3. The Fredonia Property appears to also include an easement. Because the parties do not separately address the easement, we do not mention it further here or in our analysis.

In August 2021, Marilyn filed a petition for instructions, in which she requested that the court remove Kathrin as a co-trustee and order termination of the Trust and distribution of its assets. The following month, Kathrin's husband, Tory, filed a complaint against the co-trustees in their capacity as trustees of the Trust, seeking to quiet title to a portion of the Trust's real property assets. The siblings and their respective spouses and children divided themselves into two camps, one aligning with Marilyn and the other aligning with Kathrin.

¶8 In October 2021, the siblings; Tory; and Marilyn's husband, Kim (the Parties) participated in a mediation aimed at resolving their various disputes. The mediation concluded with the Parties each signing a settlement agreement (the Settlement Agreement), which Marilyn and Kathrin executed individually as well as in their roles as co-trustees of the Trust and managers of Vermillion View. The Settlement Agreement was not signed by Maud's grandchildren or the siblings' spouses other than Tory and Kim.

¶9 Relevant to this appeal, section 1.b of the Settlement Agreement (the Vermillion View Clause) provides as follows:

> [The co-trustees] and all other Parties who have an ownership in [Vermillion View] shall vote their respective ownership interest in [Vermillion View] to dissolve [Vermillion View] and distribute the property and assets as [set forth in the Settlement Agreement].

The Vermillion View Clause then sets forth in detail how Vermillion View's assets are to be distributed upon a unanimous vote for dissolution, identifying thirteen transfers, each involving a particular piece of property that is to be granted by Vermillion View to specifically named grantees.

¶10 Regarding the Fredonia Property, section 2 of the Settlement Agreement (the Fredonia Property Clause) states as follows:

> Certain Property in Fredonia, Arizona[,] identified as Parcels [1] and [2] are owned by the Parties and their respective spouses. The Parties agree that Parcel [1] shall be deeded to [Marilyn, Pearl Ann, and Worth]. The Parties further agree that Parcel [2] shall be deeded to [Norris, Elaine, and Kathrin].

¶11 Recognizing that the Settlement Agreement addressed property interests of spouses and grandchildren who did not participate in the mediation or sign the Settlement Agreement, the Parties included section 7 of the Settlement Agreement (the Contingency Clause), which provides as follows:

> [The Settlement Agreement] is contingent upon the non-party members of [Vermillion View] and non-party owners in the Fredonia Property agreeing to transfer their respective interests or otherwise co-operating in executing the transfers contemplated herein.

*The Litigation Following Mediation*

¶12 After mediation, Marilyn gathered votes of Vermillion View members in favor of dissolving the company and distributing its assets, recording the votes on a document titled "Action Without a Meeting and Vote of Members of [Vermillion View]."[4] On that document, a "YES" vote and signature appeared

---

4. Section 7.7 of the Operating Agreement states that "[a]ction required or permitted to be taken at a meeting may be taken without a meeting if notice of the proposed action is given to or waived by all of those entitled to vote on the action, and the action is reduced to writing and is approved and signed by the same."

next to the names of Marilyn and Worth, their spouses, Pearl Ann, and Maud's grandchildren. A signature did not appear next to the names of Kathrin, Norris, Elaine, or their spouses.

¶13    In April 2021, Marilyn filed a motion to amend her original petition for instructions, which the district court granted. In her amended petition, Marilyn alleged that Kathrin, Norris, and Elaine had not complied with their obligations under the Settlement Agreement. Marilyn again asked the court for removal of Kathrin as a co-trustee and for termination of the Trust. She also asked the court to enforce the Settlement Agreement and order Kathrin, Norris, and Elaine to "pay the attorney fees [incurred in] . . . enforc[ing] the Settlement Agreement."

¶14    In November 2022, Marilyn filed a motion to enforce the Settlement Agreement. In that motion, she argued that the Settlement Agreement is unambiguous, and she asked the district court to "enforce all of the provisions . . . against" Kathrin, Norris, and Elaine by requiring them to execute the property transfers outlined in the Settlement Agreement and pay the attorney fees Marylin had incurred to enforce the Settlement Agreement.

¶15    Kathrin opposed the motion. She asserted that the Settlement Agreement could not be enforced because the Contingency Clause contained a condition that had not been met. Specifically, she noted that the Contingency Clause states that the Settlement Agreement "is contingent upon the non-party members of [Vermillion View] and non-party owners in the Fredonia Property agreeing to transfer their respective interests or otherwise co-operating in executing the transfers contemplated" in the Settlement Agreement. She attached an affidavit from Elaine's husband, Jeffrey, which stated that he does "not agree to the transfer of [his] interest in [Vermillion View] and the Fredonia Property as provided in the [Settlement Agreement]." Kathrin argued (1) that the Contingency Clause created a condition—

namely, that the owners of Vermillion View and the Fredonia Property who were non-parties "approve[] the terms of the . . . Settlement Agreement"; (2) that because Jeffrey had expressly disagreed with the terms of the Settlement Agreement, the condition had not been fulfilled; and (3) that because the Parties have no duty to perform until the condition is fulfilled, the Settlement Agreement is unenforceable.

¶16   In May 2023, the district court granted Marilyn's motion to enforce. In doing so, the court explained that the Contingency Clause states that the Settlement Agreement is contingent on the owners of the Fredonia Property and the members and managers of Vermillion View "either (i) agreeing to transfer their respective interests or (ii) otherwise cooperating in executing the transfers contemplated in the [Settlement] Agreement." The court reasoned that "[t]he use of 'or' in [the Contingency Clause] makes clear that these are two alternative scenarios" and concluded that Kathrin's proposed reading of the Contingency Clause would "erase[] any true distinction between 'agreeing' or 'otherwise cooperating,' making the plain language in [the Settlement Agreement] meaningless." The district court then analyzed, in turn, the Fredonia Property Clause and the Vermillion View Clause to determine whether Jeffrey's "affidavit trigger[ed] the failure of a condition precedent or otherwise implicate[d]" the Contingency Clause as the court had interpreted it.

¶17   As to the Fredonia Property Clause, the court observed that the Settlement Agreement was "contingent on [Jeffrey] agreeing to transfer his interest or otherwise cooperating with *the transfer as contemplated by the* [*Settlement*] *Agreement*." (Emphasis added.) It then noted that under the Fredonia Property Clause, the contemplated transfer was "that Parcel [1] shall be deeded to Marilyn, Pearl [Ann], and Worth and Parcel [2] shall be deed[ed] to Norris, Elaine, and Kathrin." The court then reasoned as follows:

> [The Fredonia Property Clause] notably uses passive voice and is broadly generic in describing who will receive a deed without stating in detail the actions that will occur to accomplish it. Also absent from this provision is any detail about what kinds of deeds the receiving parties are entitled to or what the new ownership structure of the Fredonia Propert[y] will look like. . . . The [Settlement Agreement] could have, but does not, include mandatory language specifying that the Fredonia Propert[y] would be deeded *exclusively* or *solely* to the deed recipients, or that all of the current owners would each deed all of their interests in the property to the deed recipients. "The court will not rewrite a contract to supply [the] terms which the parties omitted."

(Footnote omitted; quoting *Monaco Apartment Homes v. Figueroa*, 2021 UT App 50, ¶ 10, 489 P.3d 1132 (cleaned up).) Based on this reasoning, the court determined that the plain language of the Settlement Agreement did "not require [Jeffrey] to transfer his interest in the Fredonia Property to avoid the [Contingency Clause]" because the "contemplated transfer" could be accomplished without him doing so. The court continued,

> The transfer of [the] Fredonia Property may proceed as contemplated without [Jeffrey] taking any action at all—it will still be deeded to the named recipients as contemplated by the plain language of the [Settlement Agreement]. This will not give the named recipients exclusive ownership of the property, but exclusive ownership is not specifically contemplated by the [Settlement Agreement] . . . .

The court concluded that under the plain language of the Settlement Agreement, "the contemplated deeding of the

[Fredonia Property could] take place," notwithstanding Jeffrey's disagreement.

¶18   As to the Vermillion View Clause, the district court reasoned as follows:

> [The Vermillion View Clause] makes clear that it requires the "Parties who have an ownership interest" to vote *their* (meaning the Parties') ownership interest. The [Settlement Agreement] does not explicitly require the completion of these transfers, only that the [P]arties shall vote their ownership interest for dissolution and transfer of [Vermillion View's] property. [Jeffrey] is not a party [to the Settlement Agreement], nor can he prevent the [P]arties from voting their ownership interests in a certain way. . . . [T]he [Parties] have control over their ability to act that is independent of any action of the non-parties[;] thus[,] the [Contingency Clause] does not create a condition precedent as to [Vermillion View].

The court therefore concluded that Jeffrey could "cooperate with" the Settlement Agreement's contemplated "vote" regarding dissolution of Vermillion View and distribution of its assets "by doing nothing at all."

¶19   In sum, the district court determined that while the Contingency Clause has "meaning" and "power," it "was designed with flexibility so that a non-party saying 'I do not agree' [would] not automatically void the [Settlement Agreement] if the non-party still cooperated with the transfers." Thus, according to the court, Jeffrey's disagreement did "not trigger" the Contingency Clause because the Parties' "power to act" as required by the Settlement Agreement was "not altered by [Jeffrey's] position." Hence, the court ordered the enforcement of

the Settlement Agreement consistent with the court's interpretation of it.

¶20 Having granted Marilyn's motion to enforce, the court recognized Marilyn as the prevailing party and awarded her attorney fees, citing the Settlement Agreement's provision stating that the prevailing party in an action to enforce the Settlement Agreement would be entitled to reasonable attorney fees. Kathrin now appeals.

ISSUES AND STANDARDS OF REVIEW

¶21 Kathrin contends that the district court misinterpreted the Settlement Agreement. She asserts that when the Settlement Agreement is properly interpreted, it contains conditions that have not been fulfilled and, thus, that it cannot be enforced. Accordingly, while this appeal involves our review of an order enforcing the Settlement Agreement, the enforcement order turned on the district court's interpretation of the Settlement Agreement.

¶22 "The decision of a trial court to summarily enforce a settlement agreement will not be reversed on appeal unless it is shown that there was an abuse of discretion." *Badger v. MacGillivray*, 2016 UT App 109, ¶ 2, 374 P.3d 1053 (per curiam) (cleaned up). But "legal misinterpretation is, by definition, an abuse of discretion." *Washington County Water Conservancy Dist. v. Washington Townhomes, LLC*, 2024 UT App 55, ¶ 31, 549 P.3d 56. Thus, for practical purposes, we apply the standard of review applicable to the interpretation of settlement agreements.

¶23 A settlement agreement is a contract. *Goodmansen v. Liberty Vending Sys., Inc.*, 866 P.2d 581, 584 (Utah Ct. App. 1993). "Our standard of review of a court's contractual interpretation rulings varies depending on which stage of the analysis we are reviewing." *Rokovitz v. Manley Constr. LLC*, 2025 UT App 3, ¶ 21,

563 P.3d 433, *cert. granted*, 574 P.3d 520 (Utah July 11, 2025) (No. 20250137). As applicable here, "an interpretation of an unambiguous contract is . . . reviewed for correctness." *Id.* (cleaned up).


ANALYSIS

¶24    A district court "has the power to enter a judgment enforcing a settlement agreement if it is an enforceable contract." *Badger v. MacGillivray*, 2016 UT App 109, ¶ 2, 374 P.3d 1053 (per curiam) (cleaned up). The corollary to this principle is that a district court has no power to enter a judgment enforcing a settlement agreement if the settlement agreement is not an enforceable contract. *See id.*

¶25    A contract is not enforceable if it contains a condition and the condition has not been fulfilled. *See Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 20, 367 P.3d 994. "A condition is an event, not certain to occur, which must occur before performance under a contract becomes due." *Id.* (cleaned up). "The parties to the contract have no duty to perform until the condition is fulfilled, so the failure of a condition relieves the parties of all of their contractual duties." *Id.* (cleaned up). "The parties have no remedy for breach of contract if a condition is not fulfilled, because at that point there is simply no contract to breach." *Id.* (cleaned up). And if there is no contract to breach, there is also no contract to enforce. Hence, a contract is not enforceable if it contains a condition and the condition has not been fulfilled. *See id.*

¶26    Kathrin contends that the plain language of the Settlement Agreement creates two conditions: (1) that "the non-party Vermillion View owners vote their ownership to dissolve Vermillion View and transfer all of Vermillion View's assets" in the manner set forth in the Settlement Agreement and (2) "that the non-party Fredonia Property owners transfer their interests."

Because Jeffrey, a non-party, has expressed an unwillingness to vote to dissolve Vermillion View and distribute its assets as set forth in the Settlement Agreement and an unwillingness to transfer his interest in the Fredonia Property, Kathrin contends that the conditions have not been satisfied. Her arguments are well taken.

### A.     Vermillion View

¶27     Regarding Vermillion View, the Contingency Clause states that performance of the Settlement Agreement "is contingent upon the non-party members of [Vermillion View] . . . agreeing to transfer their respective interests or otherwise co-operating in executing the transfers contemplated" in the Settlement Agreement. There is no question as to what transfers the Settlement Agreement contemplates with regard to Vermillion View. They are the thirteen transfers set forth in the Vermillion View Clause, each involving a particular piece of property that is to be granted by Vermillion View to specifically named grantees. Nor is there a question as to how the non-party members of Vermillion View are to agree to those transfers or to otherwise cooperate in executing them. The only way the non-party members of Vermillion View can do either of those things in any meaningful, binding way is to vote their respective ownership interests in favor of dissolution of the company and distribution of its assets as set forth in the Settlement Agreement. Because Jeffrey, a non-party member of Vermillion View, has not voted his ownership interest in favor of dissolution and distribution of the company's assets as set forth in the Settlement Agreement, the relevant condition set forth in the Contingency Clause has not been fulfilled and the Settlement Agreement is unenforceable.

¶28     The district court reached a different conclusion. It noted that the Settlement Agreement "does not explicitly require the completion of" any transfers of Vermillion View property but

merely requires *the Parties* to "vote *their . . .* ownership interest[s]" in favor of dissolution and distribution of the company's assets. Thus, the court reasoned, Jeffrey could "cooperate with" the Settlement Agreement's contemplated vote "by doing nothing at all." The flaw in the district court's reasoning is that the condition set forth in the Contingency Clause is not that the non-party owners agree or otherwise cooperate with *the Parties' voting of their ownership interests*. Rather, the condition is that the non-party owners agree to or cooperate in executing *the transactions contemplated by the Settlement Agreement*. And while it is true that the Vermillion View Clause can be performed through the Parties' vote alone—with the contemplated transfers occurring thereafter—the condition that must occur before the Parties are required to perform by voting is that Jeffrey and the other non-party members of Vermillion View first express their agreement or cooperation by themselves voting in favor of dissolution and distribution of the company's assets as contemplated by the Settlement Agreement. Because Jeffrey has not so voted, the condition related to Vermillion View and its assets has not been fulfilled.

¶29    For the foregoing reasons, we conclude that the Settlement Agreement contains a condition related to Vermillion View and its assets that has not been fulfilled and that the Settlement Agreement is therefore unenforceable.

B.    Fredonia Property

¶30    Regarding the Fredonia Property, the Contingency Clause states that performance of the Settlement Agreement "is contingent upon the . . . non-party owners in the Fredonia Property agreeing to transfer their respective interests or otherwise cooperating in executing the transfers contemplated" in the Settlement Agreement. Application of this provision requires a determination of what transfers the Settlement Agreement contemplates with regard to the Fredonia Property.

¶31    The Fredonia Property Clause states that "[c]ertain property in Fredonia, Arizona[,] identified as Parcels [1] and [2] are owned by the Parties and their respective spouses." It then says that "Parcel [1] shall be deeded to" Marilyn, Pearl Ann, and Worth and that "Parcel [2] shall be deeded to" Norris, Elaine, and Kathrin. This language plainly contemplates that the whole of Parcel 1 will be deeded to Marilyn, Pearl, and Worth and the whole of Parcel 2 will be deeded to Norris, Elaine, and Kathrin. In identifying the Fredonia Property, the Fredonia Property Clause does not identify the relevant property in terms of partial interests. Instead, it identifies "Parcels [1] and [2]" in their entireties and only thereafter describes them as being "owned by the Parties and their respective spouses." The clause then states that Parcel 1—not some fractional part of it—is to be deeded to Marilyn, Pearl Ann, and Worth and that Parcel 2—not some fractional part of it—is to be deeded to Norris, Elaine, and Kathrin. We see no other reasonable interpretation of the transactions contemplated by the Fredonia Property Clause.

¶32    The district court determined otherwise, concluding that the transactions unambiguously contemplated by the Fredonia Property Clause were the transfer of only those fractional interests in Parcel 1 and Parcel 2 that are owned by the Parties and the non-parties who are willing to transfer their interests. To support its interpretation, the district court noted that the Fredonia Property Clause "uses passive voice and is broadly generic in describing who will receive a deed without stating in detail the actions that will occur to accomplish it." The court further observed that "absent from this provision is any detail about what kinds of deeds the receiving parties are entitled to or what the new ownership structure of the Fredonia Properties will look like" and that this provision "could have, but does not, include mandatory language specifying that the Fredonia Properties would be deeded *exclusively* or *solely* to the deed recipients, or that all of the current owners would each deed all of their interest in the property to the deed recipients." We disagree.

¶33  By expressly identifying Parcel 1 and Parcel 2 as the property at issue and then stating that Parcel 1 and Parcel 2 "shall be deeded" to certain recipients, the Fredonia Property Clause *does* include mandatory language specifying that the whole of each parcel is to be deeded exclusively to the identified recipients. This directive plainly contemplates that all of the current owners of the Fredonia Property each deed all of their interests in that property to those recipients. The absence of explicit details regarding the actions that will occur to accomplish this, the kinds of deeds that will be used, and the manner in which the new owners will hold title does not change the fact that this directive is plain on its face.

¶34  In support of its conclusion regarding the nature of the transactions contemplated by the Fredonia Property Clause, the district court also pointed to the language of the Contingency Clause. *See generally UDAK Props. LLC v. Canyon Creek Com. Center LLC*, 2021 UT App 16, ¶ 18, 482 P.3d 841 ("When interpreting a contract we attempt to give effect to each provision, and we look for a reading that harmonizes the provisions and avoids rendering any provision meaningless." (cleaned up)). The court noted that the Contingency Clause provides that the Settlement Agreement is contingent on the owners of the Fredonia Property "either (i) agreeing to transfer their respective interests or (ii) otherwise cooperating in executing the transfers contemplated in the [Settlement Agreement]." The court reasoned, first, that "[t]he use of 'or' in [the Contingency Clause] makes clear that these are two alternative scenarios" and, second, that a reading of the Fredonia Property Clause that contemplates a transfer of all of Parcel 1 and all of Parcel 2 would "erase[] any true distinction between 'agreeing' or 'otherwise cooperating.'" In other words, the district court believed that the Fredonia Property Clause must be read as contemplating a transfer of either all or part of Parcel 1 and Parcel 2 so that the non-party owners could either "agree" *or* "otherwise cooperate" in the contemplated transactions by doing nothing. Any other reading, the court opined, would make the

inclusion of two ways in which the non-party owners could fulfill the condition in the Contingency Clause meaningless. We are not persuaded that the language of the Contingency Clause requires reading the Fredonia Property Clause as contemplating transactions involving the transfer of potentially less than all of Parcel 1 and Parcel 2.

¶35    Notably, the Contingency Clause does not say that the non-parties can fulfill the condition set forth therein by "agreeing to transfer their respective interests or co-operating in executing the transfers contemplated therein." It says that the non-parties can fulfill the condition by "agreeing to transfer their respective interests or *otherwise* co-operating in executing the transfers contemplated therein." (Emphasis added.) "Otherwise" means "in a different way or manner." *Otherwise*, Merriam-Webster, https://www.merriam-webster.com/dictionary/otherwise [https://perma.cc/38VY-XERS]. Thus, the Contingency Clause's use of "otherwise co-operat[e]" rather than merely "co-operate" plainly indicates that the options for a non-party to fulfill the condition set forth therein are not between "agreeing" on the one hand and "co-operating" through inaction on the other. Instead, they are between two different ways or manners of "co-operating in executing the transfers," one of which involves "co-operating" and "agreeing" while the other involves "cooperating" without necessarily "agreeing."[5]

---

5. Our interpretation of the two ways in which a non-party owner of the Fredonia Property can fulfill the condition related to the Fredonia Property applies equally to how a non-party member of Vermillion View can fulfill the condition related to Vermillion View. Specifically, a non-party member of Vermillion View can cooperate in executing the transfers the Settlement Agreement contemplates with respect to Vermillion View's assets by either (1) agreeing with the contemplated transfers and thus voting for

(continued…)

¶36　This negotiated arrangement makes sense in the context of this dispute, which involves a trust established by a mother for the benefit of her children. The children mediated in an attempt to settle their differences, omitting their adult children and all but two of their spouses from the mediation process. It is not surprising that the sibling parties to such an agreement would condition their own performance on their non-participating children and spouses either (1) agreeing with the resolution reached and therefore cooperating in executing the transfers it contemplates or (2) not necessarily agreeing with the resolution but at least cooperating in its execution out of consideration for his or her parent or spouse—or in hopes of simply ending the family conflict.

¶37　Our conclusion is supported by the fact that "cooperate" and "execute" are action words. *See Cooperate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/cooperate [https://perma.cc/AV4C-JF9K] (defining "cooperate" as "to act or work with another or others"); *Execute*, Merriam-Webster, https://www.merriam-webster.com/dictionary/execute [https://perma.cc/6FZR-S4KH] (defining "execute" as "to perform what is required to give validity to (something)," as in to "*execute* a deed"). Thus, the plain meaning of the Contingency Clause cannot be the one adopted by the district court—namely, that a non-party to the Settlement Agreement can "co-operat[e] in executing" the contemplated transfers through inaction. At a minimum, the non-party owners must cooperate in executing the contemplated transfers, even though they need not independently agree to them.

¶38　In sum, we conclude that the transactions plainly contemplated by the Fredonia Property Clause are the transfer of

---

dissolution and distribution or (2) voting for dissolution and distribution despite not necessarily agreeing with the contemplated transfers.

all of Parcel 1 to Marilyn, Pearl Ann, and Worth and all of Parcel 2 to Norris, Elaine, and Kathrin. Thus, the condition in the Contingency Clause related to the Fredonia Property is that each of the non-party owners of the Fredonia Property cooperates in executing those transfers. This interpretation does not render any portion of the Contingency Clause meaningless. Rather, it allows non-party owners of the Fredonia Property to fulfill the Contingency Clause's condition by either (1) "co-operating in executing" the transfers by agreeing to them or (2) "co-operating in executing" the transfers despite their passive disagreement.

¶39   Because Jeffrey, a non-party owner of the Fredonia Property, has not cooperated in the transfer of Parcel 1 to Marilyn, Pearl Ann, and Worth and Parcel 2 to Norris, Elaine, and Kathrin by executing his portion of those transfers, the condition related to the Fredonia Property has not been fulfilled, and the Settlement Agreement is unenforceable for this reason as well.

CONCLUSION

¶40   The Settlement Agreement contains two conditions that must be fulfilled before it can be enforced: (1) the non-party owners of Vermillion View must vote to dissolve the company and transfer all of its assets in the manner set forth in the Settlement Agreement and (2) the non-party owners of the Fredonia Property must cooperate in executing a transfer of their interests, either by agreeing to that transfer or by cooperating despite their passive disagreement. Because those conditions have not been fulfilled, the Settlement Agreement is unenforceable, and we reverse the court's order enforcing it. Because that reversal precludes the designation of Marilyn as the prevailing party in her action to enforce the Settlement Agreement, we vacate the court's award of attorney fees to her. We remand the matter to the district court for such proceedings as may now be appropriate.

―――――――――